

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| CIMAREX ENERGY CO., | § | No. 08-16-00353-CV |
| Appellant, | | |
| | § | Appeal from the |
| v. | | |
| | § | 143rd District Court |
| ANADARKO PETROLEUM CORP., | | |
| | § | of Ward County, Texas |
| Appellee. | | |
| | § | (No. 15-07-23-648-CVW) |
| | | |
| | § | |

**O P I N I O N**

Appellant, Cimarex Energy Co. (Cimarex) and Appellee, Anadarko Petroleum Corp. (Anadarko), were co-tenants on certain property located in Ward County, both of whom held leases giving each of them undivided fractional mineral interests on the same property. After Anadarko successfully completed drilling operations on two producing wells on the property, Cimarex sued Anadarko alleging it had failed to account for Cimarex's share of the production. In June 2013, the parties entered into a settlement agreement requiring Anadarko to make a settlement payment for production from the two wells through May 2013, and to account to Cimarex monthly thereafter for its share of production. In August 2015, Cimarex filed the underlying lawsuit contending that Anadarko breached the Settlement Agreement when it failed to account monthly for Cimarex's share of production. Both parties moved for summary judgment, with Cimarex contending that

Anadarko breached the agreement as a matter of law, while Anadarko claimed that its obligation to make payments ceased because Cimarex's lease had expired, and because Cimarex was therefore no longer a co-tenant with any interest in the property. The trial court granted Anadarko's motion for summary judgment, but denied Cimarex's cross-motion, and this appeal followed. We affirm.

## BACKGROUND

### *Cimarex's Interests*

In December of 2009, Cimarex leased a fractional undivided 1/6th mineral interest in approximately 440 acres in Ward County, Texas, (the subject property) from the Estate of F. Kirk Johnson, III (the Cimarex lease).[1] The Cimarex lease contained a habendum clause, which provided for a primary term of five years, and a secondary term, stating that the lease remained in force after the primary term "as long thereafter as oil or gas is produced from said land or from land with which said land is pooled."[2] The lease was considered "paid-up" for the primary term, meaning that Cimarex was not required to commence drilling operations during that period of time, and was not required to pay any delay rentals to the lessor during the five years, regardless of whether it commenced operations or not.[3] *See generally ConocoPhillips Co. v. Koopmann,* 547 S.W.3d 858, 874 (Tex. 2018) (recognizing that a "paid-up" lease is one under which all delay

---

[1] The pertinent facts of this case are undisputed, and we base our factual summary primarily on the "Joint Stipulations of Fact," which the parties filed in the district court as part of the summary judgment proceedings.

[2] As explained in more detail below, a lease's habendum clause defines the mineral estate's duration. *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex. 2002) (citing *Gulf Oil Corp. v. Southland Royalty Co.,* 496 S.W.2d 547, 552 (Tex. 1973)).

[3] Delay rentals are payments made by a lessee during the primary term to perpetuate a lease when the lessee is not actively drilling or developing the leasehold. *Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.,* 564 S.W.3d 105, 113, 114 (Tex. App.—El Paso 2018, no pet.) (citing 55A Tex.Jur.3d Oil and Gas § 344 (2018)).

2

rentals bargained for are paid in advance, which maintains the lease during the primary term regardless of production). The Cimarex lease, however, specified that despite the fact that the five-year primary term was paid-up, this did not relieve Cimarex of "the obligation to pay royalties on actual production" during that time.[4] It is undisputed that Cimarex did not drill a well or commence operations for drilling a well on the subject property during the primary term of the Cimarex lease, i.e., from December of 2009 until December of 2014.

### *Anadarko's Interests*

In the meantime, between 2007 and 2010, Anadarko acquired the balance of the mineral estate in the subject property from various prior lessees, ultimately obtaining the remaining undivided 5/6th fractional mineral interest in the subject property. In addition, Anadarko obtained an entire 6/6ths leasehold mineral interest in the 200-acre remainder of the same tract of land also owned by the Johnson Estate, immediately south of the subject property (the "Southern property").

In 2011 and 2012, the Texas Railroad Commission issued permits for Anadarko to commence drilling operations on two wells on the subject property: Murjo 1 and Murjo 2 (the Murjo Wells). The parties agree that no later than February 2012, cumulative sales from the Murjo 1 Well exceeded its cumulative drilling and operations costs, and the well continued to produce in paying quantities since that time. The parties also agreed that not later than December 2012, cumulative sales from Murjo 2 exceeded its cumulative drilling and operations costs, and the well continued to produce in paying quantities since that time.

In February 2012, Anadarko also commenced drilling operations on a third well on the

---

[4] A royalty interest is "a share of production—or the value or proceeds of production, free of the costs of production—when and if there is production." *See Ridge Nat. Res., L.L.C.*, 564 S.W.3d at 114 (citing *In re Estate of Slaughter*, 305 S.W.3d 804, 811 (Tex. App.—Texarkana 2010, no pet.)).

Southern property, located near its southern border. Due to its proximity to the subject property, Anadarko sent Cimarex a Rule 37 notice of its intention to drill along the border of the property, but Cimarex did not object to the third well's location.[5] That well became fully operational on May 3, 2012.

In early 2011, F. Kirk Johnson, IV and Marsland Johnson succeeded the interests of the Johnson estate and became the new lessors of the Cimarex lease ("the lessors"). In August 2011, the lessors granted Petro-Land Group, Inc., two top leases covering the subject property.[6] In June 2012, Anadarko succeeded the interests of Petro-Land Group by assignment and obtained its interest in both top leases.

### *The Property Dispute*

On September 14, 2012, the lessors, having learned that drilling had begun on the subject property, sent an email to Cimarex demanding that it pay them for Cimarex's proportionate share of royalties on the production. Thereafter, on September 21, 2012, Cimarex sent Anadarko a letter stating that it was aware that Anadarko had drilled and completed the three wells, without seeking its participation. In the letter, Cimarex indicated that it had previously asked Anadarko to "afford Cimarex the opportunity to join in the participation of the subject wells from inception," and that

---

[5] 16 TEX. ADMIN. CODE § 3.37, commonly known as "Rule 37," provides statewide spacing rule for oil and gas wells, which requires operators to keep a certain minimum distance between drilled wells, and between wells and property lines. Under the Rule, the Railroad Commission may grant exceptions to permit drilling within shorter distances when the Commission determines that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. 16 TEX. ADMIN. CODE ANN. § 3.37(a)(1). When a mineral interest owner applies for an exception to drill a well within a certain distance of a property line, it must provide notice to all affected parties, including those with an interest in the adjacent property. 16 TEX. ADMIN. CODE ANN. § 3.37(a)(2).

[6] "[A] top lease is a subsequent oil and gas lease which covers one or more mineral interests that are subject to a valid, subsisting prior lease," also known as a "bottom lease." *TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 462 (Tex. 2018) (citing *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 478 n.1 (Tex. 2017)). A top lease becomes effective as to those mineral interests that are subject to a bottom lease upon termination of the bottom lease. *Id.*

it was formally making that request, as well as requesting that the parties enter into a joint operating agreement for each of the subject wells. In addition, Cimarex, identifying itself as a "co-tenant with a carried working interest . . . in the subject wells[,]" requested an immediate accounting of the "costs and revenues associated with each of the subject wells[.]"

It appears that Anadarko did not immediately provide accounting information to Cimarex, and in correspondence dated December 4, 2012, Cimarex made a second formal request for this information, noting that its lessors were being "inconvenienced" as Cimarex could not determine its proportionate share of the royalties it owed to them, without obtaining such information. In response, on January 2, 2013, Anadarko sent Cimarex a letter in which it recognized that Cimarex had a 1/6th interest in the minerals located on the subject property, describing Cimarex as a "non-participating co-tenant," and acknowledging that Cimarex was entitled to its "net share of proceeds after payout." Anadarko also provided Cimarex with information pertaining to the current payout status of each well, together with information regarding payment statements from the date of first sales for the second Murjo Well.

### The First Lawsuit

On February 12, 2013, apparently after payments were not forthcoming, Cimarex filed its first lawsuit against Anadarko, alleging that the two parties were "tenants-in-common" on the subject property, with Cimarex owning an undivided 1/6th leasehold mineral interest, and Anadarko owning the remaining 5/6th leasehold mineral interest. In the lawsuit, Cimarex alleged that Anadarko had drilled two wells on the property, without Cimarex's consent, and had refused Cimarex's offer to participate in the cost of the drilling. Cimarex requested an accounting of the proceeds from the two wells in excess of the reasonable and necessary costs of production. Cimarex further estimated, based on sales statements, that Anadarko owed it approximately $3.5

5

million for the net proceeds from the first well, and an undetermined amount for the second well.

### *Attempts to Pool the Third Well*

In the meantime, in December of 2012, Cimarex sent Anadarko a letter acknowledging that the third well was not located on the subject property but noting that it was drilled approximately one foot from the Cimarex lease line. Cimarex proposed the idea of pooling certain portions of the companies' respective leaseholds to form a pooled unit around the third well, referred to as the "Proposed Unit." Cimarex then made a "Voluntary Pooling Offer," suggesting that the two parties voluntarily pool all of their mineral interests within the boundaries of the Proposed Unit, sharing both "production and the costs" of the well. In response, Anadarko sent Cimarex a letter dated January 3, 2013, rejecting the offer, reminding Cimarex that it had previously provided it with a Rule 37 notice regarding the well's location, and that Cimarex did not object to the location.

On February 6, 2013, Cimarex filed an application with the Texas Railroad Commission, seeking to force Anadarko to form a pooled unit around the third well, pursuant to the Texas Mineral Interest Pooling Act.[7] In its application, Cimarex contended that the third well was "draining hydrocarbons from beneath Cimarex's leasehold," and that in the absence of compulsory pooling, Cimarex would not be compensated for the drainage. Cimarex further alleged that it would be required to drill unnecessary wells in order to recover the same hydrocarbons, and that it would therefore be in the interests of both parties to create a pooling unit, so that each party

---

[7] The Mineral Interest Pooling Act allows a mineral interest owner to apply with the Railroad Commission for a forced pooling of interests, when "two or more separately owned tracts of land are embraced in a common reservoir of oil or gas for which the commission has established the size and shape of proration units . . . and where there are separately owned interests in oil and gas within an existing or proposed proration unit in the common reservoir and the owners have not agreed to pool their interests, and where at least one of the owners of the right to drill has drilled or has proposed to drill a well on the existing or proposed proration unit to the common reservoir[.]" TEX. NAT. RES. CODE ANN. § 102.011. The stated purpose of such forced pooling is to avoid the drilling of unnecessary wells, protect correlative rights, and/or to prevent waste. TEX. NAT. RES. CODE ANN. § 102.011.

could receive its respective fair share of hydrocarbons from the field.

## *The Settlement Agreement*

In June 2013, Cimarex and Anadarko signed a confidential settlement agreement to resolve Cimarex's first lawsuit and the forced pooling application (the Settlement Agreement). Under the terms of the Settlement Agreement, Anadarko agreed to an accounting for Cimarex's share of production from the two wells on the subject property, with Anadarko agreeing to pay Cimarex for its 1/6th "non-participating co-tenant share of the value of production" through May 2013, "less only Cimarex's 1/6th co-tenant share of the reasonable drilling, completion and operations costs" of the two wells. The Settlement Agreement also provided that going forward, Anadarko would "account to Cimarex monthly for its share of production," and would provide documents to show the production revenues and allowed cost deductions on the two wells. Both parties agreed to take responsibility for paying their respective royalty interests to the lessors. Pursuant to the Settlement Agreement, Cimarex nonsuited its first lawsuit against Anadarko and dismissed its application to force-pool the third well.

## *The Current Lawsuit*

Anadarko thereafter paid Cimarex monthly from July of 2013 to December of 2014 for Cimarex's share of production, less its proportional share of operation expenses, and provided Cimarex with information to support its calculations. And based on that information, Cimarex fully paid royalties to the lessors for its share of production, according to the terms of its lease, dating back to the first date of production on the two wells. However, after December 21, 2014— the termination date for the primary term of Cimarex's lease on the subject property—Anadarko admittedly ceased making payments to Cimarex, based on its belief that Cimarex's lease had expired and that Cimarex no longer had any interest in the property that would entitle it to a share

7

of the production. As well, at this same time, again believing that Cimarex's bottom lease had expired, Anadarko asserted its entitlement to the top lease over Cimarex's 1/6th mineral interest on the property, paying a bonus to the lessors to activate the lease, which they accepted.

On August 26, 2015, Cimarex filed a breach of contract suit which forms the basis for this appeal, claiming that Anadarko breached its contractual obligations under the Settlement Agreement "by failing to account to Cimarex monthly for Cimarex's share of production from the wells."

### *The Summary Judgment Motions*

Anadarko thereafter moved for a traditional summary judgment, seeking dismissal of Cimarex's lawsuit, based on its affirmative defense that Cimarex's lease had terminated at the end of its primary term in December of 2014, due to Cimarex's failure to drill or operate a well on the subject property before the expiration of the primary term. Anadarko argued that the terms of Cimarex's lease required Cimarex to directly cause production on the subject property in order to extend the lease to the secondary term, and that Cimarex could not rely on Anadarko's actions in causing production to extend the lease. Anadarko argued that because the lease had terminated, Anadarko's top lease took effect, and consequently, Cimarex had no interest remaining in the subject property and was therefore not entitled to an accounting for production from the two wells on the subject property. Anadarko concluded that it therefore had no duty under the Settlement Agreement to continue to account for production after that time. In support of its argument, Anadarko attached the parties' stipulated facts and asserted that there were no material questions of fact to be decided, and that instead, the only question to be decided was of a legal nature, i.e., whether Cimarex's lease on the subject property had in fact expired, thereby absolving Anadarko of any obligation to continue accounting to Cimarex for its production.

Cimarex thereafter filed its own motion for "partial summary judgment" on the issue of Anadarko's liability for breach of the Settlement Agreement, arguing that the undisputed evidence demonstrated that Anadarko had in fact breached the Agreement. In its motion, Cimarex argued that, as a matter of law, its lease did not terminate at the end of the primary term, and that instead, the lease continued into the secondary term, arguing that, under the terms of the lease, it was entitled to rely on Anadarko's production to extend the lease into the secondary term, or alternatively that the Settlement Agreement served as a joint operating agreement between Cimarex and Anadarko, which served to satisfy any requirement that Cimarex may have had to actively participate in the production. In addition, Cimarex argued that Anadarko was estopped from arguing that its lease was terminated, as Anadarko stepped into the shoes of the lessors, who had been accepting royalty payments from Cimarex, which Cimarex argued estopped the lessors—and hence Anadarko—from asserting that the lease was terminated.

### *The Trial Court's Ruling*

After holding a hearing on the cross-motions for summary judgment, after which the trial court took the matter under submission, the trial court issued a written order on July 18, 2016, in which it denied Cimarex's motion for partial summary judgment, and granted Anadarko's motion for full summary judgment. In its order, the trial court specifically determined that Anadarko's summary judgment evidence established as a matter of law, that the Cimarex lease terminated on December 21, 2014, at the end of its primary term, and was not extended into a secondary term. The trial court ordered that Cimarex was to take nothing on its claim for breach of contract, and later reduced its ruling to a final judgment dismissing Cimarex's lawsuit, and awarding attorney's

fees in an amount stipulated to by the parties.[8]

## DISCUSSION

In four issues—three of which we consider together—Cimarex contends that the trial court erred in granting Anadarko's motion for summary judgment and/or in denying its cross-motion. In the three related issues, Cimarex contends that the trial court erred in concluding that its lease had terminated in December of 2014. Cimarex contends that the terms of the lease were ambiguous with regard to whether Cimarex was required to directly cause production on the property to keep the lease alive into the second term, and that this raised a question of fact for the jury to resolve. In the alternative, Cimarex contends that the lease unambiguously allowed it to rely on Anadarko's production, without the need for it to independently cause production to extend the lease beyond the primary term, and that the parties stipulated that there was in fact continuing production on the property by Anadarko. As a sub-argument to this issue, Cimarex contends that the Settlement Agreement served as a joint operating agreement, which allowed Cimarex to claim Anadarko's production as its own thereby extending the lease into the secondary term, again as a matter of law. Cimarex also contends that, even if the lease should be interpreted otherwise, Anadarko, who stepped into the shoes of the lessors, was estopped from claiming that the lease terminated, based on the lessors' acceptance of royalty payments from Cimarex. And finally, Cimarex argues in a fifth issue, that if the summary judgment cannot stand and is reversed, the

---

[8] We note that Cimarex set out additional claims in a second amended petition that it filed in addition to its original breach of contract claim, including claims for unjust enrichment and quantum meruit, and further asked for declaratory judgment in that petition. However, Cimarex nonsuited those claims after the trial court issued its order granting summary judgment on its breach of contract claim. As such, the only issue before us turns on whether the trial court properly dismissed Cimarex's breach of contract claim.

10

award of attorney's fees must be reversed as well.

### *Standard of Review on Traditional Summary Judgment Motions*

On appeal, we review a trial court's order granting a traditional motion for summary judgment *de novo.  See Border Demolition & Envtl., Inc. v. Pineda*, 535 S.W.3d 140, 151 (Tex. App.—El Paso 2017, no pet.) (citing *Valence Operating Company v. Dorsett,* 164 S.W.3d 656, 661 (Tex. 2005)); *see also Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  A party may move for a traditional summary judgment at any time, with or without supporting affidavits, for a summary judgment in his or her favor as to all or any part of a claim, counter claim or cross claim asserted against him or her. TEX. R. CIV. P. 166a(b).  A party moving for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action, and that it is entitled to judgment as a matter of law.  *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017) (citing TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017)); *see also Amedisys, Inc. v. Kingwood Home Health Care*, *LLC,* 437 S.W.3d 507, 511 (Tex. 2014). If the party meets that initial burden, the burden then shifts to the other party to raise an issue of fact as to at least one of those elements, and in order to do so, it must come forward with more than a scintilla of evidence as to that element.  *Amedisys, Inc.*, 437 S.W.3d at 511; *see also Chance*, 462 S.W.3d at 283; *Ciguero v. Lara*, 455 S.W.3d 744, 747 (Tex. App.—El Paso 2015, no pet.). However, if the party moving for summary judgment does not satisfy its initial burden, the burden does not shift, and the non-movant need not respond or present any evidence.  *See Amedisys, Inc.,* 437 S.W.3d at 511; *see also State v. Ninety Thousand Two Hundred Thirty–Five Dollars and No Cents in U.S. Currency ($90,235),* 390 S.W.3d 289, 292 (Tex. 2013) (citing *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex. 2000) (per curiam)).

11

On appeal, we review the evidence in the light most favorable to the non-movant, crediting evidence favorable to that party if reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not. *Pineda*, 535 S.W.3d at 151 (citing *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex. 2006)); *see also Lightning Oil Co.*, 520 S.W.3d at 45. We further indulge every reasonable inference in favor of the non-movant and resolve any doubts against the motion. *Lightning Oil Co.*, 520 S.W.3d at 45 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). If the trial court's order does not specify the grounds on which the summary judgment was granted, "we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex. 2003); *see also FM Properties Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex. 2000) (citing *Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex. 1995)).

When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *See Southern Crushed Concrete, LLC v. City of Houston,* 398 S.W.3d 676, 678 (Tex. 2013). In the face of dueling cross-motions for summary judgment where the trial court grants one motion but denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *see also Marrs & Smith P'ship v. Sombrero Oil & Gas Co., L.L.C.*, 511 S.W.3d 53, 58–59 (Tex. App.—El Paso 2014, no pet.). The reviewing court renders the judgment that the trial could should have rendered and may affirm if any of the theories presented

12

to the trial court and preserved for review are meritorious. *Fielding*, 289 S.W.3d at 848; *Sombrero*, 511 S.W.3d at 59.

## ISSUES ONE, THREE, AND FOUR:  INTERPRETING THE LEASE
## AND THE SETTLEMENT AGREEMENT

### *Alleged Ambiguities in the Lease*

The question of whether a lease is ambiguous is a threshold question that we must consider first before proceeding with our review of the other issues. *Clayton Williams Energy, Inc. v. BMT O & G TX, L.P.,* 473 S.W.3d 341, 348 (Tex. App.—El Paso 2015, pet. denied) (citing *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 230 (Tex. 2003) (recognizing that the threshold question in reviewing a contract is whether the instrument is ambiguous or not)).  The question of whether a contract, including an oil and gas lease, is ambiguous is a question of law for the court to decide. *Apache Deepwater, LLC v. McDaniel Partners, Ltd*., 485 S.W.3d 900, 904 (Tex. 2016); *see also Westport Oil & Gas Co., L.P. v. Mecom*, 514 S.W.3d 247, 250–51 (Tex. App.—San Antonio 2016, no pet.).

An ambiguity exists when an agreement's meaning is uncertain, or its terms are reasonably susceptible to more than one interpretation. *Tarr v. Timberwood Park Owners Ass'n, Inc.,* 556 S.W.3d 274, 280 (Tex. 2018).  If a contract is deemed ambiguous, this creates a fact issue regarding the parties' intent, thereby rendering summary judgment inappropriate. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.,* 473 S.W.3d 296, 305 (Tex. 2015).  However, when there is only one reasonable reading of a contract, the parties' intent is a pure question of law and we are bound to interpret the terms of the contract as written and not how the parties would like them to have been written.  *Clayton Williams Energy, Inc*., 473 S.W.3d at 348 (citing *Hitzelberger v. Samedan Oil Corp.,* 948 S.W.2d 497, 504 (Tex. App.—Waco 1997, pet. denied)); *Philadelphia*

*Indem. Ins. Co.,* 490 S.W.3d at 477; *see also Plains Expl. & Prod. Co.,* 473 S.W.3d at 305 (a contract is not ambiguous if the contract's language can be given a certain or definite meaning) (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 806 (Tex. 2012)). Thus, the mere fact that the parties may have different or conflicting views of how to interpret an agreement, without more, does not by itself create an ambiguity. *Apache Deepwater, LLC.,* 485 S.W.3d at 904 (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996)); *see also Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex. 2006) (citing *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex. 1981)). "Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450–51 (Tex. 2008); *see also Victory Energy Corp. v. Oz Gas Corp.*, 461 S.W.3d 159, 172 (Tex. App.—El Paso 2014, pet. denied) (we review unambiguous mineral deeds *de novo,* limiting our scope of review to the "four corners" of the document and excluding any extrinsic evidence from consideration).

The construction of an unambiguous contract is reviewed, as a matter of law, under a *de novo* standard of review. *See Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *Anadarko Petrol. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (construing meaning of an unambiguous oil and gas lease under a *de novo* standard); *see also Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 787 (Tex. 2017) (the proper construction of an unambiguous lease is a question of law to be determined by the court *de novo*). As discussed below, we conclude, as a matter of law, that there is only one reasonable interpretation of the Cimarex lease, and that the lease is therefore unambiguous; consequently, we construe the lease on a *de novo* basis in the manner set forth below.

### *Principles Relating to Construction of Mineral Leases*

Mineral leases are contracts and as such they are interpreted using the same general rules and principles that are applied in interpreting other types of contracts. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018) (citing *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (per curiam) ("An oil and gas lease is a contract, and its terms are interpreted as such.")). We therefore review and construe mineral leases *de novo*, and our objective in doing so is "to ascertain the parties' intent as expressed within the lease's four corners." *Endeavor Energy Res., L.P.*, 554 S.W.3d at 595 (in construing an oil and gas lease, a court's primary goal is to determine the parties' intent as expressed by the lease's plain language) (citing *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)); *see also TRO-X, L.P. v. Anadarko Petroleum Corp.,* 548 S.W.3d 458, 462 (Tex. 2018) (absent ambiguity in a lease, we do not look beyond its four corners for evidence of the parties' intent); *see also Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 727–28 (Tex. 1981) (when construing oil and gas leases, courts "seek the intention of the parties as that intention is expressed in the lease"). In construing a mineral lease, we presume that the parties intended every clause to have some effect, so we "examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent," to ensure that no provision is rendered meaningless. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 595 (citing *Anadarko Petroleum Corp.*, 94 S.W.3d at 554); *Plains Expl. & Prod. Co..,* 473 S.W.3d at 305 (citing *Moayedi v. Interstate 35/Chisam Rd., L.P.,* 438 S.W.3d 1, 7 (Tex. 2014)). No single provision taken alone is given controlling effect; rather, each must be considered in the context of the whole instrument. *Plains Expl. & Prod. Co..,* 473 S.W.3d at 305.

As with contracts generally, the parties to a mineral lease are free to decide their contract's

15

terms, and the law's "strong public policy favoring freedom of contract" compels courts to "respect and enforce" the terms on which the parties have agreed. *Endeavor Energy Res., L.P.,* 554 S.W.3d at 595 (citing *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)). However, although mineral owners and operators generally enjoy the freedom to contract as they wish, they must nevertheless exercise that freedom within the limits of the Texas Railroad Commission's statewide field rules. *Id.* at 596. Because of this unique regulatory context, mineral leases often contain terms and clauses that other kinds of leases and contracts do not, which we must take into consideration.[9] *Id.* at 596-97. "It is a well recognized canon of construction that technical words are to be interpreted as usually understood by persons in the business to which they relate, unless there is evidence that the words were used in a different sense." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 211 (Tex. 2011).

### *Relevant Oil and Gas Lease Provisions*

A mineral lease grants a fee simple determinable to the lessee. *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017) (citing *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex. 2002)). As a result, "the lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose." *Id.* (citing *Thompson*, 94 S.W.3d at 554). However, if the event upon which the mineral estate is limited occurs, then the lessee's mineral estate terminates automatically. *Id.*

---

[9] In general, the Texas Natural Resources Code regulates oil and gas operators with regard to the production, storage and transportation of oil and gas to ensure that their operations are conducted in a manner, in an amount, or under conditions to avoid waste. *See generally* TEX. NAT. RES. CODE ANN. §§ 85.045, 85.048, 85.051, 85.055, 85.056. The Code further gives the Texas Railroad Commission the authority to adopt "all necessary rules for governing and regulating persons and their operations . . . including such rules as the commission may consider necessary and appropriate to implement state responsibility under any federal law or rules governing such persons and their operations[,]" and further gives the Commission jurisdiction over all oil and gas wells in Texas, as well as those persons owning, operating such wells. TEX. NAT. RES. CODE ANN. §§ 81.051, 81.052.

A lease's habendum clause defines the mineral estate's duration. *Thompson*, 94 S.W.3d at 554. A typical clause states that the lease lasts for a relatively short fixed term of years (primary term) and then "as long thereafter as oil, gas or other mineral is produced (secondary term)." *Id.* Ordinarily, "such a habendum clause requires actual production in paying quantities." *Id.* The word "produce" in a habendum clause "is synonymous with the phrase 'producing in paying quantities.'" *Hydrocarbon Mgmt., Inc. v. Tracker Expl., Inc.*, 861 S.W.2d 427, 432 n.4 (Tex. App.—Amarillo 1993, no writ).

Production in paying quantities means "the production is sufficient to pay the lessee a profit, even small, over the operating and marketing expenses, although the cost of drilling the well may never be repaid." *Hydrocarbon Mgmt., Inc.* 861 S.W.2d at 432 n.4. Thus, after the primary term, an oil and gas lease generally may be kept alive "by production in paying quantities." *Id*. However, a typical Texas lease that lasts "as long as oil or gas is produced" automatically terminates if actual production permanently ceases during the secondary term. *Thompson*, 94 S.W.3d at 554 (citing *Amoco Prod. Co. v. Braslau,* 561 S.W.2d 805, 808 (Tex. 1978)). Finally, we note that even though the habendum clause in a lease generally controls the mineral estate's duration, other clauses may be considered in determining the habendum clause's term. *BP Am. Prod. Co., LLC*, 526 S.W.3d at 394 (citing *Thompson*, 94 S.W.3d at 554; *see also Endeavor Energy Res., L.P.,* 554 S.W.3d at 597 (because a mineral lease is a creature of contract, parties may modify the effect of a habendum clause by including other provisions). The question of when a lease terminates "is always a question of resolving the intention of the parties from the entire instrument." *Anadarko Petroleum Corp.* 94 S.W.3d at 554 (citing *Gulf Oil Corp. v. Southland Royalty, Co.,* 496 S.W.2d 547, 552 (Tex. 1973)); *see also BP Am. Prod. Co., LLC*, 526 S.W.3d at 394.

***The Lease Required Cimarex to Cause Production to Extend the Lease into the
Secondary Term***

Cimarex contends that the trial court erred by concluding that its lease terminated in December of 2014 due to Cimarex's failure to cause production on the subject property. In support of its argument, Cimarex first points out that the habendum clause in the lease stated that the lease was to remain in effect after the expiration of the initial five-year term for "as long thereafter as oil or gas is produced from said land or from land with which said land is pooled." Cimarex argues that the plain language of the habendum clause, which was written in the passive voice, only required production on the subject property, and did not require Cimarex to be the one to actually cause the production. Cimarex points out that there was in fact production on the subject property—albeit production caused by Anadarko—and contends that this was sufficient to extend the lease into its secondary term. According to Cimarex, the parties deliberately chose to draft the lease in the passive voice, allowing for any production on the subject property to suffice to extend the lease into the secondary term, regardless of who caused the production. Cimarex contends that if we were to add in the requirement that Cimarex had to be the one to cause production we would be adding in a term not found in the lease. In other words, we would be rewriting terms and going against the intent of the parties. We disagree.

As Anadarko points out, various Texas courts, including this Court, have interpreted similar mineral leases—which contain habendum clauses requiring production to keep a lease alive without specifying who was required to cause the production—to impose an obligation on the lessee to actually cause the production. Anadarko relies on this Court's holding in *Hughes v. Cantwell*, 540 S.W.2d 742 (Tex. App.—El Paso 1976, writ ref'd n.r.e.) in support of its argument. In that case, the lessor gave the lessee, Hughes, a fractional mineral interest covering the subject

18

tract, with a primary term of five years, beginning in November of 1971. *Hughes*, 540 S.W.2d at 743. The primary term of the lease, however, was not paid-up, and instead contained what is known as an "unless" clause, stating that "[i]f operations for drilling [were] not commenced on said land. . . on or before one year from this date the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender to Lessor" delay rental payments. *Hughes*, 540 S.W.2d at 743. Hughes did not commence any operations on the well but instead began paying delay rentals on the first anniversary date of the lease, in November of 1972, and did so for one year before he ceased making payments. *Id.* In the meantime, another lessee, Atlantic Richfield, which held the majority of the remaining mineral interest on the tract, commenced drilling operations in April of 1973, which resulted in a paying well by September of 1973. *Id.* Before commencing drilling, Atlantic Richfield notified Hughes of its plan to drill the well and invited Hughes to join in sharing the expenses. *Id.* Hughes declined, and Atlantic Richfield therefore completed the well on its own. *Id.* Shortly thereafter, in November of 1973, Hughes ceased making delay rental payments to the lessors, and the lessors filed an action to terminate Hughes's lease due to his failure to make the payments and/or commence drilling on the land; the trial court agreed with the lessors that the lease had terminated in November of 1973, due to Hughes's failure to make the delay rental payments. *Id.*

On appeal, Hughes argued that he was not required to make delay rental payments under the terms of the lease, asserting that the lease only required payments when there was no drilling on the property, and that the undisputed evidence established that there was drilling on the property, albeit by Atlantic Richfield. *Id.* In other words, Hughes argued that the lease did not require him to be the one to commence drilling, and that the lease allowed him to rely on Atlantic Richfield's drilling operations to avoid the obligation of making the delay rental payments. *Id.*

19

We rejected this argument, and instead construed the lease to require Hughes to be the one to commence drilling operations on the property to keep his lease alive, or in the alternative to make delay rental payments, concluding that Hughes could not rely on the actions of others in order to fulfill this requirement. *Id*. at 743-44.

In reaching this conclusion, we reviewed the lease in its entirety, noting that there were several clauses throughout the lease imposing obligations on Hughes to take action in a variety of circumstances, thereby implying that the lessor intended to impose an obligation on Hughes to be the one to engage in production to keep the lease alive. *Id.* at 744. For example, we noted that the lease expressly required *Hughes* to make delay rental payments and required him to pay royalties. *Id*. at 744. In addition, the lease provided that *Hughes* had the power to pool the lease; contained a cessation of production clause, which provided that the lease would not terminate if *Hughes* commenced additional drilling or reworking operations after hitting a dry hole; and contained a force majeure clause that provided that the lease would not terminate in the event that *Hughes* was prevented from complying with its terms. *Id.* at 744.

We further found it significant that the stated purpose of the parties' lease was for the drilling and producing of oil and gas, and that it naturally followed that the lessors expected Hughes to "do something to bring about that exploration and production of oil and gas," which could include, among other things, doing the drilling himself, assigning it to someone else to drill, or "pool it with others and benefit from their drilling," none of which Hughes did. *Id.* at 744. Thus, we concluded that, "[e]ven though there was drilling and production by another, on the failure of Appellant Hughes to either pay the delay rental or to commence operations for drilling on the leased premises, personally or constructively" resulted in the automatic termination of the lease. *Id.* at 744. In reaching this conclusion, we noted that no Texas court had previously decided

this exact question, but we found five other cases holding in various situations that a lessee "must participate or pay his share of the drilling in order to keep his lease alive." *Id*. at 744.

As in *Hughes*, the Cimarex lease expressly stated that its purpose was for the production of oil and gas; specifically, the lease stated that the parties were entering into it for the purpose of "investigating, exploring, prospecting, drilling and operating for and producing oil and gas," as well as other minerals, and to erect various structures on the property in order to "produce, save, take care of, treat, process, store and transport said minerals[.]" Therefore, as in *Hughes*, we must naturally conclude that the parties' intent was for Cimarex to "do something to bring about that exploration and production of oil and gas," after the paid-up portion of the lease expired. *Hughes*, 540 S.W.2d at 744.

Further, as in *Hughes*, the Cimarex lease contained various other provisions imposing requirements on Cimarex to take action in other contexts to keep the lease alive. For example, as set forth above, the lease expressly required Cimarex to pay royalties on actual production during both the primary and secondary terms of the lease. The lease also contained a "cessation" clause, which stated that if, "after the expiration of the primary term, all wells upon said land should become incapable of producing for any cause, this Lease shall not terminate if *Lessee* commences operations for additional drilling or for reworking within 60 days thereafter, and shall remain in force so long as operations are prosecuted with no cessation of more than 60 consecutive days, whether such operations be on the same well or on a different or additional well or wells [emphasis added]." In addition, the lease expressly gave Cimarex the right and power to pool or combine the lease with other co-tenants on the property, requiring Cimarex to designate any pooled units, and expressly stating that production from such pooled units would be considered as "production" under the terms of the lease. As well, the lease gave Cimarex the right to assign the lease and

21

further gave it use of oil, gas and water from the land for its operations. And finally, the lease gave Cimarex the right to remove its property from the lease at the expiration of the lease's term. Accordingly, as in *Hughes*, these provisions imply that the lessors intended for Cimarex to be the one to cause production on the property in order to extend the lease into the secondary term.

Cimarex, however, seeks to distinguish its lease from the one in *Hughes*, pointing out that the lease in *Hughes* contained an "unless" clause governing the entire lease term, allowing the lessee to substitute actual production with payment of delay rentals, while the Cimarex lease contains a "thereafter" clause requiring production in the secondary term only, and not offering the option of paying delay rentals. We conclude, however, that the same principles govern the interpretation of both types of leases. As we explained in *Hughes*, where a mineral lease states that its primary intent is for the exploration, drilling and production of oil and gas, it naturally follows that the lessors' intent is to require the lessee to, at some point in time, take action to cause production on the land, or provide some type of cash consideration, such as delay rental payments, to keep a lease alive. *Hughes*, 540 S.W.2d at 743; *see also Hydrocarbon Mgmt.,* 861 S.W.2d at 437–38 (where the purpose stated in the habendum clauses of the leases is for "'exploring, drilling, mining and operating for and producing oil, gas and all other minerals . . . ' [i]t naturally follows that the intention of the parties was for the lessees to do something that would bring about the exploration and production of oil and gas"); *Endeavor Energy Res., L.P.,* 554 S.W.3d at 597 (lessors typically desire that the operator fully develop the lease and produce as much as possible to maximize the lessors' royalties, as "the dominant purpose of a lease is to discover and produce oil and gas . . . ") citing *Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 315 (1953) (Wilson, J., concurring)). We find that this same principle applies regardless of whether a lease contains an "unless" or a "thereafter" clause.

22

Thus, in *Mattison v. Trotti*, 262 F.2d 339, 340 (5th Cir. 1959), which we cited favorably in our opinion in *Hughes*, the Court interpreted a mineral lease that included both an "unless" clause, as well as a "thereafter" clause similar to the one found in the Cimarex lease. *Mattison*, 262 F.2d at 340-41; *see also Hughes,* 540 S.W.2d at 744 (expressly agreeing with the *Mattison* court's interpretation of Texas law). The lease in *Mattison* provided for a five-year primary term, stating that the lease would terminate if drilling operations were not commenced before the one-year anniversary of the lease—without specifying that the lessees were the ones required to commence drilling—"unless" on or before such anniversary date, the lessee paid delay rentals to the lessor. *Id*. at 340-41. The lease further stated that the lease would remain in effect during the primary term "or as long thereafter as oil or gas or either of them is produced from said land," again without specifying that the lessees were the ones required to cause the production. *Id.* at 341. The lessees, however, did not commence any drilling operations during the first year, and failed to pay any delay rentals after that time. *Id*. at 340. The lessees, however, argued that because the lease did not specify who was required to commence drilling, they were permitted to rely on their co-tenants' drilling operations to keep the lease alive after the first anniversary of the lease. *Id*. at 340-41.

The Fifth Circuit rejected this argument, pointing out that the clear intent of the lease was to require the lessees to commence drilling during the primary term, or in the alternative to pay delay rentals, in order to keep the lease alive. *Id*. at 340-41. The Court held that it would be contrary to the uniform holding of the Texas decisions that in an oil and gas lease, "where there is no cash consideration paid, the drilling for and the production of oil or gas by the lessee is the prime consideration, and if not so stated in the lease will be read into it." *Id*. at 341. As such, we conclude that the requirement that a lessee must take action to keep a lease alive, in the absence of some form of cash consideration, remains the same—regardless of whether the lease contains an

23

"unless" clause and/or a "thereafter" clause.

In the present case, the primary term of the Cimarex lease was based on a cash consideration, as this portion of the lease was "paid-up." And, as discussed above, this meant that Cimarex was not required to engage in any activities in order to keep the lease alive during that term. However, the secondary term was *not* based on a cash consideration, and instead required actual production on the land. Therefore, we conclude that the intent of the lease was in fact to require Cimarex to take some action to cause production on the subject property in order to keep the lease alive, and that it could not simply rely on a cotenant's production in the absence of any cash consideration paid to the lessors. [10]

### *The Payment of Royalties Did Not Extend the Lease into the Secondary Term*

Cimarex next points out that it paid royalties to the lessors during the primary term based on Anadarko's production on the land, and thus it contends that it would be inherently inconsistent to interpret the lease to require it to pay royalties on Anadarko's production during the primary term, while not allowing Cimarex to rely on Anadarko's production to keep the lease alive into the secondary term. In particular, Cimarex argues that the lease used the passive tense in describing the nature of the lease in both the primary and secondary terms, requiring Cimarex to pay royalties on any production on the land to keep the lease alive during the primary term, without specifying who was to cause the production, and similarly requiring production on the land to extend the lease

---

[10] Cimarex also cites *Cain v. Neumann*, 316 S.W.2d 915 (Tex. Civ. App.—San Antonio 1958, no writ), arguing that it involved a similar habendum clause. We find *Cain* to be inapposite. *Cain* did not involve the issue of whether production by one lessee to a lease would affect the lease of a different lessee under a different lease. *See id.* at 917. Rather, the issue in that case was whether the production of minerals (salt) by the assignee of the right to mine salt under an original "base" lease perpetuated the right of other assignees of rights to develop other mines under the same lease. *Id.* at 920. The court found there that production of minerals by one assignee extended the lease as to all minerals as to all assignees to the "base" lease. *Id.* at 917. The issue here, as in *Hughes*, involves lessees who had different leases on the same property, and did not involve the rights of assignees to a lease.

into the secondary term, again without specifying who was to cause the production. Cimarex argues that given the similar use of the passive voice in both instances, the two should be construed in the same fashion; in effect, Cimarex argues that if this Court were to rewrite the lease to require it to cause production on the land to extend the lease, it would also be required to rewrite the lease to only require it to pay royalties on its own production as well, which would effectively entitle it to a refund of the payments that it made to the lessors. We disagree with this argument for several reasons.

First, we note that a lessor has the right to impose additional or different requirements on a lessee to keep a lease alive during the primary term, in contrast to those imposed in the secondary term. *See generally PEC Minerals LP v. Chevron U.S.A., Inc.,* 439 Fed. Appx. 413, 420 (5th Cir. 2011) (recognizing a lessor's right to impose different requirements on a lessee during different terms of a lease). Thus, there is nothing inherently contradictory with a lessor requiring a lessee to make royalty payments on a co-tenant's production during the primary term of a lease—particularly where the primary term is paid-up—while at the same time requiring the lessee to cause its own production on the subject property in order to extend the lease into a secondary term, where there is no cash consideration paid.

Moreover, if we were to interpret the lease in the manner suggested by Cimarex, we would in effect be concluding that there were no significant differences between the requirements imposed on Cimarex in both the primary and secondary terms in the lease. In other words, under Cimarex's interpretation, the requirements imposed on Cimarex during both the primary term and the secondary term would be identical, with Cimarex only being required to pay royalties on Anadarko's production during both terms. If the lessors had wanted to impose the same requirements on Cimarex for both terms, i.e., the requirement to pay royalties on another co-

25

tenant's production—with no additional cash consideration paid and no additional obligations imposed on Cimarex—there would have been no point in dividing the habendum clause into two separate terms. In other words, this interpretation would render the secondary term completely superfluous and would go against the general principle that the parties intended every clause in the lease to have some effect. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 595. This we decline to do, and instead, we find it appropriate to harmonize the two provisions in the lease to give effect to both of them, interpreting the lease to allow Cimarex to rely on Anadarko's production during the paid-up primary term of the lease, while requiring it to cause its own production in the secondary term, as no cash consideration was given for that term.

### *Cimarex's Public Policy Argument*

Cimarex next raises a public policy argument, contending that we should not rule that its lease terminated based on its lack of production, pointing out that unlike the lessee in *Hughes*, it made repeated unsuccessful attempts to enter into a formal joint operating agreement with Anadarko, the majority mineral interest owner, to participate in the Murjo Wells. *Hughes*, 540 S.W.2d at 743. Cimarex finds this distinction to be important, pointing out that as a minority mineral interest owner, it is at a distinct disadvantage when a majority interest owner rejects its attempts to join in its operations. In particular, Cimarex points out that minority-interest owners are often unable to economically commence operations on their own, without the cooperation of the majority interest owner; Cimarex asserts that if we rule that its lease terminated, despite its attempts to join in Anadarko's operations, this will place minority mineral interest owners, like itself, in an untenable financial position and would discourage operators from taking minority interest leases such as this in the future.

Anadarko counters that Cimarex's request to participate in its operations should have no

26

bearing on our decision, and we agree. As Anadarko points out, Cimarex and Anadarko were mere co-tenants on the property; they owed no duties to each other and were legally entitled to act independently. The law is well-settled that co-tenants with mineral interests on the same property may independently develop the land subject to their interest and may do so without permission of a non-participating co-tenant; conversely, a producing co-tenant cannot force the non-participating co-tenant to enter into an agreement to pay the costs of such production. *See Cox v. Davison,* 397 S.W.2d 200, 201-202 (Tex. 1965) (recognizing that a non-participating cotenant owes "no obligation . . . to pay a part of the costs of development" and owes "no debt or personal obligation to [the producing cotenant]"); *see also Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 426 (Tex. 2008) ("It has long been the rule in Texas that a cotenant has the right to extract minerals from common property without first obtaining the consent of his cotenants[.]"). *Hughes*, 540 S.W.2d 744 (quoting *Myers v. Crenshaw*, 116 S.W.2d 1125, 1129 (Tex. Civ. App.—Texarkana 1938), *aff'd*, 137 S.W.2d 7, 134 Tex. 500 (1940) (each cotenant "acts for himself and no one is the agent for the other nor has any authority to bind the other merely because of the relationship unless authorized to do so"). Instead, as discussed in more detail below, a "cotenant who produces minerals from common property without having secured the consent of his cotenants is accountable to them on the basis of the value of the minerals taken less the necessary and reasonable cost of producing and marketing the same." *Cox*, 397 S.W.2d at 201; *see also Burnham v. Hardy Oil Co.*, 147 S.W. 330 (Tex. Civ. App.—San Antonio 1912), *aff'd*, 108 Tex. 555, 195 S.W. 1139 (1917).

We presume that Cimarex was aware of the laws relating to co-tenancy when it entered into the lease agreeing to take a minority interest. In other words, we presume that Cimarex knowingly took the risk that other tenants on the land might refuse to agree to a joint operating

27

agreement, and that it might be forced to, at some point, commence production on its own, as contemplated by the terms of the lease. Moreover, we note that Cimarex, despite being a minority mineral interest owner, did in fact benefit from the lease by receiving payments from Anadarko based on its production during the primary term of the lease. As other lessees stand to reap this same type of benefit, we do not believe that a ruling in Anadarko's favor in this instance will discourage other operators from taking similar leases in the future.[11]

### *The Settlement Agreement was not a Joint Operating Agreement*

We recognize, however, that if a lessee enters into a joint operating agreement with a cotenant, who then causes production on the land, this may fulfill the lessee's requirement of causing production on the land. *See generally Willson v. Superior Oil Co.*, 274 S.W.2d 947, 951–52 (Tex. Civ. App.—Texarkana 1954, writ ref'd n.r.e.) (lease requirement that expressly required production on the land by the lessee was satisfied when lessee entered into an operating agreement with a cotenant who successfully caused production on the land); *see also Hughes,* 540 S.W.2d at 744 (recognizing that a lease may be kept alive when a lessee enters into a joint operating agreement with the lessee of another undivided interest and paid his proportionate part of the cost of drilling a well on the combined lands). Cimarex contends that the parties' Settlement Agreement should be considered the equivalent of a joint operating agreement, and that this should satisfy any requirement in the lease for it to cause actual production. Anadarko, on the other hand, contends that the Settlement Agreement did no more than give Cimarex its proportionate share of production as a co-tenant on the property. We agree with Anadarko on this point.

---

[11] We also note that Cimarex failed to come forward with any evidence that it was not feasible for it to drill its own well on the property; in particular, it provided no information regarding the financial feasibility of drilling its own well, and provided no evidence that the Texas Natural Resources Code and/or the Texas Railroad Commission rules would have barred any such drilling.

28

As set forth above, in the absence of a joint operating agreement, a co-tenant has a duty to account to other co-tenants for the value of any minerals taken, less the reasonable costs of production and marketing. *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 557 (Tex. App.—San Antonio 2011, no pet.) (citing *Wagner & Brown, Ltd.*, 282 S.W.3d at 426); *see also* § 14.32.Rights of cotenants in Texas mineral estates, 3A Tex. Prac., Land Titles And Title Examination § 14.32 (3d ed.) (the rule in Texas in oil and gas cases is that a cotenant producing oil or gas must account to his co-owners for the value of the oil or gas produced less the reasonable cost of producing and marketing) (citing, inter alia, *Tynes v. Mauro*, 860 S.W.2d 168, 176 (Tex. App.—El Paso 1993, no writ)); *Cox*, 397 S.W.2d at 201-202 (a non-joining, or non-participating, cotenant holds only its right to an accounting of net revenues after payout from wells drilled by the producing cotenant). Although a co-tenant must share the profits it reaps from production on the land with other co-tenants, it cannot force the other co-tenants to share in the risks; in other words, "if a co-tenant drills a dry hole, he does so at his own risk and without right to reimbursement from his co-tenant (in the absence of an agreement therefor) for the drilling costs." *Willson,* 274 S.W.2d at 950 (citing 31 TEX. JUR. SEC. 11, pp. 36-37; *Burnham v. Hardy Oil Co.*, 147 S.W. 330 (Tex. Civ. App.—San Antonio 1912), *aff'd*, 108 Tex. 555, 195 S.W. 1139 (1917); *Prairie Oil & Gas Co. v. Allen*, 2 F.2d 566 (8th Cir. 1924); *Earp v. Mid-Continent Petroleum Corporation*, 167 Okl. 86, 27 P.2d 855 (1933)).

In contrast, although no particular form of agreement is required, the hallmarks of a joint operating agreement include an agreement to share in the "expense of development and operation." *Willson,* 274 S.W.2d at 951. Of significance, such agreements not only describe the proportionate costs to be shared by the parties, but also allocate the "liabilities" to be shared as well. *Hill v. Heritage Res., Inc.,* 964 S.W.2d 89, 110 (Tex. App.—El Paso 1997, pet. denied).

Further, as the Texas Supreme Court has recognized, the basic function of a joint operating agreement is to designate an "operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations." *See Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 344 n.1 (Tex. 2006) (citing 3 *Ernest E. Smith & Jacqueline L. Weaver, Texas Law of Oil and Gas* § 17.3 at 17–7 (2d ed. 2006)); *see also Hill,* 964 S.W.2d at 110 (operating agreements are for the exploration and development of designated oil and gas within a prescribed geographical area, with one party being appointed as an "operator" who is responsible for the management and control of drilling, development, and production activities); *see generally* 55A Tex. Jur. 3d Oil and Gas § 585. And finally, a party claiming the existence of a joint operating agreement must be able to "rightfully say that the exploration and development of the premises is his act in whole or in part." *Willson.,* 274 S.W.2d at 951 (finding the existence of a joint operating agreement where parties agreed to share the risk of loss). *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316, 322 (Tex. App.—El Paso 1982, writ ref'd n.r.e.) (recognizing that a joint operating agreement "spread[s] the risk of drilling operations" and requires parties to the agreement to reimburse the operator for certain expenses incurred on their behalf), *disapproved on other grounds, Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005)).

In the present case, the Settlement Agreement gave Cimarex the rights of a co-tenant, i.e., the right to an accounting of its 1/6th share or production, less costs and expenses, but did not include any language that would suggest that the parties intended to enter into a joint operating agreement. In particular, there is nothing in the Agreement indicating that Cimarex and Anadarko agreed to jointly develop the subject property or that the parties agreed to designate Anadarko as the operator; nor did the Agreement include any language to suggest that Cimarex was entitled to

30

consider Anadarko's production as its own, or that the Agreement was intended to satisfy Cimarex's obligation to cause production on the land under the terms of its lease. And perhaps of most significance, there is nothing in the Settlement Agreement that allocated any of the costs or risks between the parties, or imposed any responsibility on Cimarex to share in any losses that Anadarko might incur in its operations; instead, Cimarex stood to reap the profits from Anadarko's production, while assuming no risk for any losses. And finally, we also find it significant that the Agreement itself, rather than referring to the parties as joint operators, expressly referred to Cimarex as a "non-participating co-tenant." [12]

Cimarex, however, argues that there are three additional provisions in the Settlement Agreement that gave Cimarex rights that are not typically found in a traditional co-tenancy relationship, including a provision in which Anadarko agreed to pay severance taxes on Cimarex's share of production, a provision giving Cimarex the "right to audit the documents" it received from Anadarko concerning its revenues and deductions annually, and a provision in which Anadarko agreed to pay attorney's fees in any successful action to enforce the terms of the Settlement Agreement. Although Cimarex argues that these provisions make it more analogous to an operating agreement, it has cited no authority for that proposition.

Moreover, we agree with Anadarko that these provisions represent nothing more than negotiated terms of the parties' settlement agreement. As Anadarko points out, the right to audit and the right to attorney's fees were provisions that enabled Cimarex to enforce its rights under the lease.[13] Further, while the Agreement stated that Anadarko agreed to pay severance taxes on

---

[12] We also note that in its first lawsuit against Anadarko, Cimarex described itself as a co-tenant, and only sought to assert its rights in that capacity.

[13] We recognize that the right to an annual audit may be included in a joint operating agreement. *Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 912 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (joint operating agreement

Cimarex's share of production, the Agreement further stated that Anadarko could deduct any taxes it paid as an allowed deduction from Cimarex's share of production. As such, the inclusion of these provisions does not persuade us that the parties intended for the Settlement Agreement to serve as the functional equivalent of a joint operating agreement.

### The Parties' Post-Settlement Conduct did not Confirm the Existence of a Joint Operating Agreement

Cimarex next contends that we should consider the actions that the parties took after they entered into the Settlement Agreement as being confirmation that they intended for the Agreement to serve as a joint operating agreement. In particular, Cimarex contends that Anadarko sent it information regarding its proportionate costs of repairs and other expenses, and on at least two occasions, asked Cimarex for approval of the costs. Cimarex also contends that Anadarko treated Cimarex in an identical manner after entering into the Settlement Agreement as it did another co-tenant, SWEPI, LP, which had a formal operating agreement with Anadarko on the subject property. Cimarex contends that Anadarko's conduct should be considered in determining whether the Settlement Agreement can be considered the equivalent of a joint operating agreement, in order to keep its lease alive. We find this argument to be unpersuasive for the following reasons.

First, and of most importance, as Anadarko points out, there are no ambiguities in the Settlement Agreement, and as set forth above, we must interpret an unambiguous agreement based on a review of the agreement itself, without considering evidence of the parties' conduct. *See Frost Nat'l Bank v. L&F Distrib., Ltd.*, 165 S.W.3d 310, 313 n.3 (Tex. 2005) (refusing to consider course of performance evidence when the plain language of the contract was clear); *see also Hill*,

---

gave nonoperator the right to audit); *Valero Energy Corp. v. Teco Pipeline Co*., 2 S.W.3d 576, 587 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (joint operating agreement gave nonoperator the right to audit). However, we fail to see how the inclusion of this provision, standing alone, cannot convert the Settlement Agreement into a joint operating agreement, in the absence of any other indication that the parties intended for it to operate in that manner.

964 S.W.2d at 133 (unambiguous mineral lease was to be construed as written); *Clayton Williams Energy, Inc.,* 473 S.W.3d at 348 (citing *J.M. Davidson, Inc.,* 128 S.W.3d at 230) (construing contract by looking only to its text without consulting parole evidence). In particular, we again find it significant that the Agreement expressly identified Cimarex as a "non-participating co-tenant," and contained no language that would indicate that the parties intended to treat their relationship as anything other than a co-tenancy. Therefore, we find that the parties' post-settlement conduct is irrelevant to our analysis.

Moreover, even if we were to consider the evidence of the parties' conduct, we agree with Anadarko that the evidence does not support a finding that the parties treated the Settlement Agreement as a joint operating agreement. As Anadarko points out, the parties did exchange information regarding the costs and expenses that Anadarko incurred in operating the Murjo Wells, but this was done primarily as a means of providing information on how Anadarko calculated Cimarex's net share of production, i.e., to apprise Cimarex of the costs it was deducting in arriving at that figure. And as Anadarko points out, there is no evidence that Cimarex agreed to shoulder any of the costs or to assume any of the liabilities of that production as one would expect if the parties were in a joint operating agreement. To the contrary, the summary judgment evidence in the trial court included an uncontroverted affidavit from Mark Urey, a landman for Anadarko, who attested that Anadarko paid all costs of the Murjo Wells and shouldered all of the risks in drilling and operating the wells. Instead, it appears that Cimarex accepted the invoices and other cost information that it received from Anadarko and acquiesced in deductions made by Anadarko in calculating Cimarex's net share of production. There is no evidence that Cimarex shouldered any risk or liabilities inherent in the operation of the Murjo Wells. Thus, regardless of how the parties may have referred to each other in communications, the parties did not in fact engage in any

33

conduct that would suggest that they were treating the Settlement Agreement as a joint operating agreement with each other.[14]

Having concluded that the Cimarex lease unambiguously required Cimarex to cause production on the land in order to extend its lease into the Secondary term, and further concluding that the Settlement Agreement did not serve as a joint operating agreement that could fulfill this requirement, we overrule Cimarex's first, third, and fourth issues.

## ISSUE TWO:  THE ESTOPPEL ARGUMENT

In its second issue, Cimarex argues that Anadarko is equitably barred from claiming that the lease terminated based on the fact that Cimarex paid royalties—which were accepted by the lessors—during the primary term of the lease.  Cimarex argues that the lessors' acceptance of these royalties, which were based on Anadarko's production, estopped them from asserting that Cimarex was not entitled to rely on Anadarko's production in order to extend the lease into the Secondary term.  Cimarex argues that the lessors were therefore estopped from asserting that the lease terminated based on Cimarex's lack of production, and in turn, Anadarko stepped into the shoes of the lessors and would also be estopped from doing so.

### *Quasi-Estoppel*

Quasi-estoppel is an equitable doctrine that prevents a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by the party.  *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *Fasken Land & Minerals, Ltd. v.*

---

[14] We note that although there are communications in the record in which Anadarko referenced the existence of an "Operating Agreement," and/or referred to Cimarex as being a "Working Interest Owner," these communications referenced not only the Murjo Wells, but other wells in which the parties may have had a formal joint operating agreement, and/or listed the interests of SWEPI, LP., who did in fact have a formal joint operating agreement with Anadarko with regard to the Murjo Wells.

*Occidental Permian Ltd.*, 225 S.W.3d 577, 593 (Tex. App.—El Paso 2005, pet. denied). In general, it "applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it had acquiesced, or from which it had accepted a benefit." *Fasken Land*, 225 S.W.3d at 593; *Bank of Am., N.A. v. Prize Energy Res., L.P.*, 510 S.W.3d 497, 511 (Tex. App.—San Antonio 2014, pet. denied); *Baron v. Mullinax, Wells, Mauzy & Baab, Inc.*, 623 S.W.2d 457, 462 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.) (defendant was estopped from claiming contract was invalid).

### *Analysis*

We assume for purposes of our analysis that Anadarko stepped into the shoes of the lessors and could not assert its position that Cimarex's lease terminated unless the lessors could do so themselves. *See, e.g., Cambridge Prod., Inc. v. Geodyne Nominee Corp.,* 292 S.W.3d 725, 732 (Tex. App.—Amarillo 2009, pet. denied) (recognizing that a party with a top lease has no right to assert the termination of a bottom lease unless the mineral interest owners who were the lessors had such a right). However, we do not agree with Cimarex that the lessors were estopped from terminating the lease based on their acceptance of royalties during the primary term of the lease. As explained above, we have interpreted the habendum clause in the Cimarex lease to require Cimarex to pay royalties on *any* production on the land during the "paid-up" primary term of the lease, while requiring Cimarex to cause actual production on the subject property to extend the lease into the secondary term. Therefore, the fact that the lessors accepted royalties during the primary term based on Anadarko's production did not preclude them from asserting that the lease terminated due to Cimarex's failure to cause production on the subject property after the primary term ended.

Moreover, there is nothing in the record to suggest that the lessors accepted any royalty

35

payments from Cimarex during the secondary term, or otherwise engaged in any conduct that would have estopped them from asserting that the lease was terminated at the end of the primary term. Accordingly, we find nothing in the record to support Cimarex's argument that Anadarko should be estopped from asserting that the lease did not extend into the secondary term. We thus overrule Cimarex's second issue.

## ISSUE FIVE: THE AWARD OF ATTORNEY'S FEES

In its fifth and final issue, Cimarex contends that the award of attorney's fees must be reversed because the trial court's judgment cannot stand. Citing to the Settlement Agreement, Cimarex argues that the judgment's award of attorney's fees to Anadarko cannot survive since it is not a "prevailing party." The Settlement Agreement provided:

> The prevailing Party or Parties in any cause of action brought by any other Party or Parties to enforce this Agreement, pursuant hereto or in connection herewith, including, without limitation, any action for declaratory or equitable relief, shall be entitled to recover from the non-prevailing Party or Parties reasonable attorney's fees, expenses and costs of suit incurred by the prevailing Party or Parties in such action.

Because the trial court ruled in Anadarko's favor in granting its motion for summary judgment and in denying Cimarex's motion, and because we uphold that judgment, we conclude that Anadarko is a prevailing party entitled to the recovery of attorney's fees under the terms of the Settlement Agreement. Cimarex's fifth issue is overruled.

## CONCLUSION

We affirm the judgment of the trial court as we conclude that it properly granted summary judgment dismissing Cimarex's lawsuit, that it properly denied Cimarex's motion for summary judgment, and that it properly awarded attorney's fees to Anadarko as the prevailing party.

GINA M. PALAFOX, Justice

March 13, 2019

Before McClure, C.J., Rodriguez, and Palafox, JJ.