# Supreme Court of Texas

No. 20-0505

In re Eagleridge Operating, LLC,
*Relator*

On Petition for Writ of Mandamus

**Argued September 30, 2021**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Lehrmann did not participate in the decision.

In this premises-defect case, relator Eagleridge Operating, LLC seeks mandamus relief from a trial court order striking its responsible-third-party designation under Chapter 33 of the Texas Civil Practice and Remedies Code. Eagleridge contends that a former wellsite owner–operator bears continuing responsibility for injuries caused by a burst gas pipeline under a theory that the former owner acted as an independent contractor in constructing, installing, and maintaining the pipeline. In *Occidental Chemical Corp. v. Jenkins*, we "reject[ed] the notion that a property owner acts as both owner and independent contractor when improving its own property" and held that, after the creator of a dangerous premises condition has conveyed ownership of

real property, the property's new owner "ordinarily assumes responsibility for the property's condition with the conveyance."[1] Eagleridge failed to persuade the lower courts that *Occidental* is inapplicable here because the former owner held a minority interest and received an operations fee while serving as "operator of record" with a co-owner's assent. We agree with those courts that *Occidental* is controlling and that the former owner's responsibility for premises defects did not survive conveyance of its ownership interest. We therefore deny Eagleridge's petition for writ of mandamus.

## I

Aruba Petroleum, Inc. owned a minority working interest in the Donnell 2H wellsite, served as operator of record, and received an operations fee with the consent of the majority working-interest owner, USG Properties Barnett II, LLC.[2] An "operator" is the "person who assumes responsibility for the physical operation and control of a well

---

[1] 478 S.W.3d 640, 644, 648 & n.7 (Tex. 2016) (noting that Sections 352 and 353 of the *Restatement (Second) of Torts* recognize a limited exception to the general rule that a property owner's responsibility for premise conditions terminates on conveyance).

[2] Eagleridge now disputes the existence of Aruba's ownership interest but did not do so in the trial court and, to the contrary, repeatedly acknowledged Aruba's ownership interest. The record also bears documentary and testimonial evidence to that effect.

as shown by a form the person files with the [Texas Railroad Commission] [that] the commission approves."[3]

As working-interest owners of undivided oil and gas rights, Aruba and USG were tenants in common with possessory interests in land, giving each the right to enter the premises to drill, produce, and otherwise exploit the minerals without the consent of the other.[4] Absent an agreement, the common law permits a mineral co-tenant to extract oil and gas but requires a producing co-tenant to account to the nonconsenting or nonproducing co-tenant for its pro rata share of production, net of necessary and reasonable expenses incurred in producing and marketing the same.[5] Absent an agreement, the common

---

[3] TEX. NAT. RES. CODE § 89.002(2) (defining "operator" with respect to abandoned wells); *see id.* § 91.551 (defining "operator" with respect to certain drilling operations as "a person who assumes responsibility for the regulatory compliance of a well as shown by a form the person files with the commission and the commission approves"); 16 TEX. ADMIN. CODE § 3.58 (Certificate of Compliance and Transportation Authority; Operator Reports); *cf.* TEX. NAT. RES. CODE § 89.002(3) (defining "nonoperator" as a working-interest owner who is not an "operator" as the term is defined in Section 89.002(2)).

[4] *Byrom v. Pendley*, 717 S.W.2d 602, 605 (Tex. 1986); *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 599 n.3 (Tex. App.—Austin 2000, pet. denied) (citing 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 1191 (1999)); *Willson v. Superior Oil Co.*, 274 S.W.2d 947, 950 (Tex. Civ. App.—Texarkana 1954, writ ref'd n.r.e.); *see* 1 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 5.1 (1987) ("As a consequence of the division of ownership of a single tract among separate owners, no single owner has exclusive or separate rights as to any particular portion of the tract, but all such owners have a common ownership and share proportionately in the enjoyment of the property as a whole.").

[5] *Byrom*, 717 S.W.2d at 605; *Cimarex Energy Co. v. Anadarko Petroleum Corp.*, 574 S.W.3d 73, 96 (Tex. App.—El Paso 2019, pet. denied); *Willson*, 274 S.W.2d at 950.

law provides that if a co-tenant drills a dry hole, it does so at its own risk, without the right to pro-rata reimbursement for the drilling costs.[6]

To exercise operating rights effectively and to share the risks and costs of drilling, it is not uncommon for co-tenants to make some sort of contractual arrangement.[7] The basic function of an operating agreement is to designate an operator, delineate the operator's authority, share expenses, and "spread the risk of drilling operations."[8]

The record reflects that, as operator of record for the Donnell 2H wellsite, Aruba was responsible for drilling, operating, and servicing the well and securing proper equipment. Aruba would also prepare Joint Interest Billing statements accounting for the incurred expenses and allocating them in proportion to the co-tenants' ownership interests. In

---

[6] *Cimarex Energy*, 574 S.W.3d at 96; *Willson*, 274 S.W.2d at 950; *cf. Byrom*, 717 S.W.2d at 605 (asserting a co-tenant's accounting for its mineral extraction is based on "the value of any minerals taken, less the necessary and reasonable costs of production and marketing").

[7] 1 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 5.6 (1987) ("If the parties involved are cotenants . . . they normally enter into an operating agreement . . . or some other arrangement for cooperative development and operation."); 2 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 19A.6 (1989) ("When operating rights in the same land are owned by more than one person, some sort of arrangement must be made before the operating rights can be exercised effectively.").

[8] *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 344 n.1 (Tex. 2006) ("An operating agreement is a contract typical to the oil and gas industry whose function is to designate an 'operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations.'" (quoting 3 ERNEST E. SMITH & JACQUELINE L. WEAVER, TEXAS LAW OF OIL AND GAS § 17.3 at 17–7 (2d ed. 2006))); *Hamilton v. Tex. Oil & Gas Corp.*, 648 S.W.2d 316, 322 (Tex. App.—El Paso 1982, writ ref'd n.r.e.), *disapproved on other grounds by Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 664 (Tex. 2005).

2013, while Aruba was the wellsite's owner–operator, a gas line was installed on the property, and Aruba and USG paid their proportionate share of the pipeline construction expenses.

Four years later, in April 2017, Aruba conveyed its ownership interest to USG and contemporaneously ceased serving as the Donnell 2H operator of record. Several months before the conveyance, USG had entered into a written contract with Eagleridge to serve as operator, but Eagleridge did not assume control of the wellsite until May 1, 2017. A few months later, the gas line ruptured, injuring plaintiff Earmon Lovern.

Lovern and his wife and children sued Eagleridge and USG, asserting claims for negligence and gross negligence with respect to the construction, installation, and maintenance of the pipeline, among other things. Eagleridge timely filed a motion for leave to designate Aruba as a responsible third party.[9] In its motion to designate, Eagleridge asserted that Aruba, as a prior owner–operator, caused or contributed to causing the Loverns' injuries because it was responsible for installing the gas line, selecting the materials used for its construction, and determining its placement on the property.

The Loverns filed a combined motion to strike Aruba's designation and motion for partial summary judgment, arguing that under this Court's opinion in *Occidental*, a former premises owner has no duty, and thus no responsibility, with respect to the condition of property after conveyance—even as the creator of an allegedly defective

---

[9] *See* TEX. CIV. PRAC. & REM. CODE § 33.004(a), (f), (h).

5

improvement.[10] As the Loverns pointed out, *Occidental* had overturned a lower court's ruling that a premises owner could act in a "dual capacity" as both (1) owner of the premises where the dangerous condition existed and (2) creator or designer of the dangerous condition.[11] In *Occidental*, we expressly "reject[ed] the notion that a property owner acts as both owner and independent contractor when improving its own property" and instead held that an owner–creator's duties "generally run[] with the ownership or control of the property," passing on to the new owner when property is sold.[12]

In response, Eagleridge urged that *Occidental* is distinguishable on its facts because it involved a sole owner–operator's premises improvements while, here, Aruba was not merely a property owner but also received a fee to serve as operator of record and made improvements to the property in that capacity. Based on these distinctions, Eagleridge argued that *Occidental* does not preclude a property owner from factually and legally wearing two hats, each with different consequences under the law. In that vein, Eagleridge took the position that premises-liability principles would not dictate the existence or extent of Aruba's duty because, under ordinary negligence principles, Aruba had a duty as an "independent contractor" and that duty did not terminate when its control over the property ceased.

---

[10] 478 S.W.3d 640, 648 (Tex. 2016).

[11] *Id.* at 647.

[12] *Id.* at 644, 648 (citing RESTATEMENT (SECOND) OF TORTS §§ 351-54 (AM. L. INST. 1965)).

The trial court granted the motion to strike and the motion for partial summary judgment, prompting Eagleridge to seek mandamus relief, which the court of appeals denied. In a split decision, the court held that *Occidental* precludes Eagleridge's argument that Aruba acted in a dual capacity—one in which its responsibility for premises defects admittedly did not survive termination of its ownership interest and the other in which it would remain liable as an independent contractor with respect to improvements it had allegedly constructed on the property during its ownership term.[13] Because *Occidental* holds that an owner does not act as an independent contractor with respect to improving its own property, the court held that, as a former property owner at the time of the accident, Aruba had no potential responsibility for the Loverns' injuries and the trial court properly struck the responsible-third-party designation.[14]

The dissent concluded that the designation was proper because Eagleridge produced some evidence that Aruba was "working under a third party contract" with the majority-interest owner, USG, when it allegedly constructed a hazardous condition and, if the jury so found, Aruba would remain responsible in its capacity as an independent contractor.[15] The dissent declared *Occidental* distinguishable on its facts, concluding that the articulated rule applies only when "the owner

---

[13] 627 S.W.3d 478, 480-81 (Tex. App.—Dallas 2020).

[14] *Id.*

[15] *Id.* at 481-82, 484 (Whitehill, J., dissenting).

7

does the work itself, that is, without hiring an actual independent contractor to do the work for the owner."[16]

The dissent would have applied the rule in *Strakos v. Gehring*, which disavowed the "accepted work" doctrine and held that an independent contractor is not relieved of responsibility for shoddy work "solely because his work has been completed and accepted in an unsafe condition."[17] The dissent cited *Strakos* for the proposition that "there can be concurrent negligence cases involving an injury caused by a dangerous property condition when two different people are responsible for that dangerous condition."[18] Although acknowledging that *Strakos* involved two separate (non-owner) contractors performing separate tasks with respect to the dangerous condition, the dissent concluded that a property owner can nonetheless "have concurrent negligence liability for a dangerous property condition when that person acts as both (i) a partial owner with premises liability duties and (ii) an actual independent contractor under contract with a third party."[19] In short, notwithstanding Aruba's ownership interest, the dissent viewed evidence of Aruba's agreement to serve as operator of record and receipt of an operation fee as raising a fact issue that it was acting as a third party which, in turn, raised a fact issue as to whether Aruba had a duty that survived conveyance of its ownership interest to USG.

---

[16] *Id.* at 481.

[17] *Id.* at 482 (citing *Strakos v. Gehring*, 360 S.W.2d 787, 790-91 (Tex. 1962)).

[18] *Id.* at 484.

[19] *Id.*

In this original proceeding, as in the lower courts, Eagleridge argues that Aruba's duty is not determined by *Occidental*. But Eagleridge also raises two new issues: one concerning the proper construction of the proportionate-responsibility statute and the other asserting an unpleaded and previously unasserted exception to the rule that a landowner's responsibility for premises conditions terminates on conveyance.[20] After briefs on the merits were filed, and the Loverns had objected to Eagleridge's newly raised issues, we abated the original proceeding pursuant to Texas Rule of Appellate Procedure 7.2(b) to allow a successor trial judge to reconsider the original ruling. The mandamus record shows that the successor judge was only asked to consider *Occidental*'s application to the circumstances alleged in this case. On that matter, the judge found *Occidental* controlling and declined to make "an exception to *Occidental*'s dual-role analysis for liability of an independent contractor that also owns a fractional-working interest in the property."[21]

Because the trial court was asked only to consider *Occidental*'s application, we will not address Eagleridge's other issues. This is an original proceeding, so Eagleridge's failure to raise those issues in the

---

[20] USG did not designate Aruba as a responsible third party or join the trial-court filings on the matter, but in the court of appeals, USG filed an amicus brief supporting Aruba's designation as a responsible third party and, in this Court, filed briefing as a real party in interest aligned with Eagleridge.

[21] *Lovern v. Eagleridge Operating, LLC*, No. DC-18-05402 (192nd Dist. Ct., Dallas County, Tex. Apr. 26, 2021) (order confirming plaintiff's motion to strike responsible third party).

court of appeals is not prohibitive of our consideration.[22] But its failure to raise the issues in the trial court—both initially and after abatement—is an entirely different matter.[23] "Due to the extraordinary nature of the remedy, the right to mandamus relief generally requires a predicate request for action by the respondent, and the respondent's erroneous refusal to act."[24] Eagleridge has given us no reason to relax that requirement.[25] Mandamus will not issue unless the respondent judge clearly abused her discretion, and she could not have done so as to unpleaded and unpresented issues. Accordingly, we confine our review to whether *Occidental* precludes Aruba's responsibility for any defects in the pipeline.

---

[22] *In re AIU Ins.*, 148 S.W.3d 109, 121 (Tex. 2004) (holding that failure to present an argument in the court of appeals did not preclude mandamus relief where all arguments had been presented to the trial court).

[23] *Id.*; *cf. West v. Solito*, 563 S.W.2d 240, 244 (Tex. 1978) ("We do not pass on the merits of these arguments because the release that is central to both of these arguments was not placed in issue before the trial court, thus depriving that fact finder of the opportunity to determine from the facts and circumstances surrounding the release if there was an implied waiver of the privilege.").

[24] *In re Coppola*, 535 S.W.3d 506, 510 (Tex. 2017) (declining to consider a ripeness challenge that was first raised in the mandamus petition).

[25] *See In re Perritt*, 992 S.W.2d 444, 446 (Tex. 1999) (relaxing the predicate request-and-refusal requirements because the record established that a recusal request would have been futile and merely a formality given that a codefendant's recusal request on the same grounds had already been denied) (quoting *Terrazas v. Ramirez*, 829 S.W.2d 712, 723 (Tex. 1991)).

## II

## A

In any cause of action to which Chapter 33 of the Texas Civil Practice and Remedies Code applies, "[t]he trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility" for the alleged harm as to each claimant, defendant, settling person, and properly designated responsible third party.[26] A "responsible third party" is "any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these."[27] Section 33.004 generally permits a tort defendant to designate a person as a responsible third party by filing a motion "on or before the 60th day before the trial date."[28] The trial court "shall grant leave to designate . . . a responsible third party" unless a party timely objects and establishes that (1) the defendant did not plead sufficient facts concerning the person's alleged responsibility to satisfy the pleading requirements in the rules of civil procedure, and (2) after an opportunity

---

[26] TEX. CIV. PRAC. & REM. CODE §§ 33.002(a), .003(a), .004(a).

[27] *Id.* § 33.011(6).

[28] *Id.* § 33.004(a); *see* *id.* § 33.002 (making the proportionate-responsibility statute applicable to tort and deceptive-trade-practices claims).

11

to replead, the pleading defect persists.[29]  This standard is reminiscent of special exceptions.

Although trial courts have no discretion to deny a timely filed motion to designate absent a pleading defect and an opportunity to cure, the trial court must strike the designation if, after an adequate time for discovery, (1) a party asserts that no evidence supports the designated person's responsibility for the claimant's injury or damage, and (2) the defendant fails to "produce[] sufficient evidence to raise a genuine issue of fact."[30]  Consistent with the statute's language, our courts of appeals have described the standard of review as mirroring a no-evidence summary judgment.[31]

As a general proposition, mandamus is warranted only when "the trial court clearly abused its discretion and the relator has no adequate appellate remedy."[32]  We have held that the mandamus standard is satisfied when a trial court erroneously denies a party's timely filed motion to designate a responsible third party.[33]  The issue here is not the same but is arguably analogous: whether the trial court erroneously

---

[29] *Id.* § 33.004(g).

[30] *Id.* § 33.004(*l*).  Chapter 33 also prohibits "a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission."  *Id.* § 33.003(b).

[31] *See Ham v. Equity Residential Prop. Mgmt. Servs., Corp.*, 315 S.W.3d 627, 631 (Tex. App.—Dallas 2010, pet. denied); *cf. Flack v. Hanke*, 334 S.W.3d 251, 262 (Tex. App.—San Antonio 2010, pet. denied) (opining that "[t]he similarity in language between Section 33.004(*l*) and a no-evidence summary judgment is not coincidental").

[32] *In re Coppola*, 535 S.W.3d 506, 508 (Tex. 2017).

[33] *In re Mobile Mini, Inc.*, 596 S.W.3d 781, 788 (Tex. 2020).

struck Aruba's designation as a responsible third party. The Loverns, as real parties in interest, question whether mandamus is appropriate when a designation has been stricken—as opposed to being denied in the first instance—because the decision to grant leave to designate is made on the pleadings while an order striking a designation is based on the merits and is similar to a summary judgment, for which mandamus is usually unavailable. The Loverns suggest that mandamus from an order striking a responsible-third-party designation should only be permitted when the relator demonstrates that the benefits of mandamus outweigh any detriments in the particular case. We need not decide this issue, however, because we conclude that the trial court did not abuse its discretion in striking Aruba's designation.

**B**

When an independent contractor erects a structure or creates a condition on behalf of an owner or possessor of land, "the modern approach is to place [such] contractors on the same footing as manufacturers of goods and apply the same general principles of negligence even after" the landowner or possessor has accepted the contractor's work.[34] Renouncing the "accepted work" doctrine, our *Strakos* opinion, like Section 385 of the Second Restatement of Torts, recognizes that an independent contractor or third party who creates a dangerous property condition while making improvements "on behalf of" property owners may remain responsible under ordinary negligence principles for injuries the condition causes even after the contractor has

---

[34] *Strakos v. Gehring*, 360 S.W.2d 787, 792 (Tex. 1962).

13

completed the work and no longer has control over the condition or the premises.[35] But "*Strakos* speaks only to the actions of third parties" and "does not purport to separate a property owner's responsibility for dangerous property conditions from the owner's control over the property."[36]

As we explained in *Occidental*, a property owner "may have responsibility for a dangerous condition on its property whether created by the owner or others," but the property owner's duty is "not the same" as an independent contractor's for any such condition.[37] Rather, the owner's duty "is rooted in its control over the property, which is to say premises liability."[38] "Under premises-liability principles, a property owner generally owes those invited onto the property a duty to make the premises safe or to warn of dangerous conditions as reasonably prudent under the circumstances," but this duty "generally runs with the

---

[35] *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 646-47 (Tex. 2016) (discussing *Strakos* and Section 385). *But see Allen Keller Co. v. Foreman*, 343 S.W.3d 420, 425 (Tex. 2011) (holding that an independent contractor had no duty to rectify an unreasonably dangerous premises condition arising from the construction of an improvement where the contract required the contractor's strict compliance with what was ultimately a faulty design, the contract afforded the contractor no discretion to vary from its terms, and the work conformed to required specifications).

[36] *Occidental*, 478 S.W.3d at 646.

[37] *Id.*

[38] *Id.* When an injury results from a contemporaneous negligent activity on the premises, rather than the property's condition, ordinary negligence principles apply. *Id.* at 644. Here, neither the allegations nor the evidence implicates Aruba in a contemporaneous negligent activity.

14

ownership or control of the property and upon a sale ordinarily passes to the new owner."[39]

Eagleridge asserts that, legally and factually, this case lies in the interstices of our negligence jurisprudence, falling closer to *Strakos* than *Occidental*. Eagleridge concedes that *Occidental* would control but for Aruba's paid engagement as operator of record, and it acknowledges that, as a working-interest owner, Aruba could have installed the pipeline even if USG had not consented. The question we must determine is whether property-owner Aruba could become an independent contractor with respect to its co-tenant, USG, because Aruba was compensated—in some fashion under the terms of some agreement[40]—to take responsibility for operating the wellsite even though it had the right, both as an owner and as an operator of record, to construct improvements on the property.

---

[39] *Id.* (citing RESTATEMENT (SECOND) OF TORTS §§ 351-54 (AM. L. INST. 1965)). The Restatement recognizes an exception that extends the duration of a property seller's responsibility if the seller actively conceals or fails to disclose a condition but only if the purchaser does not know or have reason to know of the condition or risk and, depending on the circumstances, any such liability continues only until the purchaser discovers the condition or has a reasonable opportunity to discover it and take precautions. RESTATEMENT (SECOND) OF TORTS § 353; *see Occidental*, 478 S.W.3d at 648 n.7 (referencing the exception but stating that it was not implicated under the facts of that case). Eagleridge did not plead or present this exception in the trial court and adduced no evidence that USG—the purchaser of Aruba's interest—did not know or have reason to know about the condition.

[40] The record does not include evidence of any written agreement between Aruba and USG with regard to wellsite operations, but it is undisputed for purposes of the issue before us that there was some agreement between the working-interest owners to share expenses and pay an unspecified operations fee to Aruba.

15

In *Occidental*, the sole owner–operator of a chemical plant, Occidental, upgraded the plant's chemical vats by adding devices that allowed for the addition of acid to the vats.[41] Occidental used its own employees to design, construct, and install the device,[42] as its status as owner and operator authorized it to do. After Occidental sold the plant to another company,[43] one of the devices malfunctioned, injuring a worker.[44] The worker sued Occidental, alleging that its negligent design of the acid-addition system caused his injuries.[45] Based on jury findings supporting Occidental's statute-of-repose defense, the trial court rendered judgment that the worker take nothing.[46]

The court of appeals reversed, holding that Occidental occupied "dual roles" as owner and as creator of a dangerous condition and its responsibility could be determined independently with respect to each of those capacities.[47] Although the court concluded that Occidental, as a former owner, no longer had premises-liability exposure, the court nonetheless held that, under ordinary negligence principles, Occidental retained a duty arising from its installation of the device.[48]

---

[41] *Occidental*, 478 S.W.3d at 642-43.

[42] *Id.* at 644.

[43] *Id.* at 643.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 643-45, 647.

[48] *Id.* at 643-45.

We reversed and rendered judgment that Occidental had no responsibility, and thus no liability, for the plant's condition after conveyance of its ownership interest. In doing so, we repudiated the lower court's "dual-role" analysis and "the notion that a property owner acts as both owner and independent contractor when improving its own property, subjecting itself to either premises-liability or ordinary-negligence principles depending on the injured party's pleadings."[49] Instead, "premises-liability principles apply to a property owner who creates a dangerous condition on its property, and [] the claim of a person injured by the condition remains a premises-liability claim as to the owner–creator, regardless of how the injured party chooses to plead it."[50] Occidental's liability was foreclosed because it no longer bore any responsibility for the property's condition, which the property's new owner had assumed along with the conveyance.[51]

*Occidental* precludes the dual-role analysis Eagleridge champions here. *Occidental* holds that a property owner, when making improvements on its own property, acts solely in its capacity as an owner and not as an independent contractor.[52] The analysis is not altered by evidence that USG paid Aruba to operate the wellsite, which we accept as true. *Occidental*'s core holding is based on ownership,[53] and Aruba was a property owner exercising its possessory right to develop its

---

[49] *Id.* at 647-48.

[50] *Id.* at 648.

[51] *Id.* at 648-49.

[52] *Id.* at 648.

[53] *Id.* at 646.

17

property when it allegedly installed the gas line. Just as in *Occidental*, the record shows Aruba was at all relevant times a property owner improving its own property, not a third party acting on behalf of a property owner. An operating agreement might incentivize a fractional working-interest owner to exercise its operating rights, but those rights are inherent in the ownership interest. Aruba's right to construct the pipeline was independent of, did not arise from, and was not extinguished by its agreement to serve as operator of record.[54] Eagleridge adduced no evidence to the contrary. Consequently, Aruba's responsibility to any person injured from the gas line must arise from premises liability, and when USG acquired Aruba's ownership interest, it "assumed responsibility" for the property condition its co-owner purportedly created.[55]

---

[54] Not all mineral fee or leasehold interests carry possessory or development rights. *See Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 341 n.1, 344 (Tex. 2020) (explaining that an overriding royalty interest is a non-possessory property interest in a share of production that is created and paid out of a lessee's interest under a mineral lease); *Lesley v. Veterans Land Bd.*, 352 S.W.3d 479, 487 (Tex. 2011) (comparing the property rights of executive and non-executive mineral-interest owners); *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) ("A Texas mineral lease grants a fee simple determinable to the lessee."). We do not address *Occidental*'s application to a situation in which a mineral-interest holder lacking the property right to construct improvements contracts to do so with someone who holds that right.

[55] The parties dispute whether the record contains any evidence that Aruba itself installed the pipeline and, thus, whether Aruba could ever be held responsible as an independent contractor under *Strakos*. Because we resolve this case on other grounds, we need not decide this evidence-sufficiency question.

Aruba's receipt of compensation for its efforts as operator of record neither transforms it from an owner into an independent contractor or third party nor materially distinguishes the facts of this case from *Occidental*. Rather, the payment of a fee among co-owners reflects the reality that revenues and expenses are typically shared proportionally, but time and labor often are not. The owner in *Occidental* was not an independent contractor merely because it may have reaped economic rewards from improvements to the property, and Aruba is not any less of an owner because it was compensated on the front end rather than solely on the back end. Here, the record bears evidence of tasks Aruba was required to undertake as operator of record that served the interests of both co-tenants, including but not limited to operating the well, securing equipment, and preparing Joint Interest Billing statements tracking the co-tenants' proportionate share of expenses. It is not at all surprising that an owner undertaking such tasks might make an agreement that, in substance, reallocates revenues and expenses with respect to jointly beneficial efforts. Such an arrangement is, in essence, a true-up among co-owners, and it should not ordinarily subject the owners to different duties post-conveyance with respect to the same property condition.

In sum, we decline to create an exception to *Occidental*'s dual-capacity analysis for a fractional working-interest property owner who also takes responsibility for wellsite operations as an operator of record. Being financially compensated for managing your property interests in a tenancy in common does not give rise to a third-party relationship with respect to the property but is more akin to

reapportioning revenues and expenses among co-owners. When the sole owner of property, like the owner–operator in *Occidental*, does all the work and retains all the revenue, the owner is no less compensated for its operation efforts than Aruba was while working for the benefit of all the working-interest owners. Under the exception Eagleridge advocates, some owner–operators would have open-ended liability while other owner–operators would not. Eagleridge does not offer any reason why the law should inject such disparity and uncertainty into co-tenancy relationships.

### III

On the record before the Court, we hold that an agreement strictly between tenants in common to allocate expenses, assign responsibilities, and compensate for disparate efforts in a joint endeavor does not create an exception to *Occidental* as to improvements each party would otherwise have been free to construct without the consent of the other. The trial court did not abuse its discretion in striking Eagleridge's responsible-third-party designation because Aruba ceased to have any responsibility for the premises conditions, and thus had no duty under premises-liability principles, after USG acquired Aruba's ownership interests. We therefore deny Eagleridge's mandamus petition.

_____
John P. Devine
Justice

**OPINION DELIVERED:** March 11, 2022

20