COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| DAVID W. CROMWELL, | § | No. 08-22-00129-CV |
| Appellant, | § | Appeal from the |
| v. | § | 143rd Judicial District Court |
| ANADARKO E & P ONSHORE, LLC, | § | of Loving County, Texas |
| Appellee. | § | (TC# 18-10-923) |

## O P I N I O N

In this dispute over the validity of oil and gas leases and related partnership claims, David Cromwell appeals the trial court's judgment granting Anadarko E & P Onshore LLC's traditional and no-evidence motions for summary judgment and denying his cross-motion for partial summary judgment. We affirm.

### *Factual and Procedural Background*

In 2009, Cromwell executed two oil and gas leases in Loving County with Carmen Ferrer and the Tantalo trust. Ferrer and the Tantalo trust each owned small fractional interests in the acreage, so Cromwell acquired a minority working interest.[1] The Ferrer lease conveyed a mineral lease in "[a]ll of sections 22, 23, 24, 25, 26, 27 Block 75 Public School Land Survey . . . for the

---

[1] Together, the two leases gave Cromwell a net working interest of .00410156 in the land.

purpose of exploring by geological, geophysical and all other methods, and of drilling, producing and operating wells for the recovery of oil, gas and other hydrocarbons . . . that may be produced from any well on the leased premises[.]" It included a habendum clause defining the lease's duration as a primary term of three years (ending on February 2, 2012) and a secondary term stating the lease would continue "as long hereafter as oil, gas or other minerals are produced from said land[.]" The lease was "paid up," meaning Cromwell was not required to commence drilling operations or pay delay rentals during the primary term.

The Tantalo lease similarly conveyed a mineral lease "for the sole and only purpose of exploring, drilling, operating power stations, and construction of roads and structures thereon to produce, save, care for, treat and transport oil, gas and liquid hydrocarbons from . . . [a]ll of Sections 22, 23, 24, 25, and 26, Block 75, Public School Land Survey[.]" Its habendum clause had a primary term of five years (ending on March 13, 2014) and a secondary term stating the lease would continue "as long thereafter as oil, gas, liquid hydrocarbons or their constituent products . . . is produced in commercial paying quantities from the lands leased hereby." The Tantalo lease was also paid up.

Anadarko owned substantial working interests in the same land. Before Cromwell obtained his two leases, Anadarko had executed joint operating agreements among other working interest owners (not including Cromwell) who collectively agreed to "explore and develop" the leases contributed by the parties to the agreements. Anadarko was named as operator under all joint operating agreements and thus the designated party to do the actual drilling for the other parties. After Cromwell acquired the Ferrer and Tantalo leases, he submitted his leases to Anadarko and asked for a joint operating agreement to participate in the wells Anadarko had drilled or planned

2

to drill in the land. Cromwell followed up on his request to participate in Anadarko's wells multiple times, but Anadarko never responded.

Before Cromwell obtained his leases, Anadarko drilled three vertical wells as operator under the joint operating agreements: the Hughes & Talbot 75-23-1 Well; the Hughes & Talbot 75-25-1 Well; and the Hughes & Talbot 75-26-1 Well.[2] These wells were all on land located within the bounds of Cromwell's leases. The 75-26-1 well reached payout in August 2009,[3] and Anadarko accordingly began sending Cromwell joint interest invoice summaries (also called joint interest billings or "JIBs") reflecting the share of operating expenses for the well chargeable to his gross working interest and checks from the well's revenues corresponding to his net working interest. Cromwell paid all joint interest invoices Anadarko sent, which included charges for a variety of operational costs, including equipment, labor, and environmental remediation. Anadarko later started netting the amount Cromwell owed for the well's costs each month against his share of production proceeds, such that some months Cromwell paid Anadarko and others he received a revenue check.

Anadarko also sent Cromwell an authorization for expenditure in June 2011. The authorization was addressed to a "working interest owner" and listed Cromwell as a "Working Interest Owner" on the signature page. Rather than an invoice for incurred operating expenses, the authorization for expenditure "propose[d]" to replace the 75-26-1 well's existing compressor for an estimated total cost of $108,000. It asked Cromwell to "indicate[] [his] election to participate in the installation" of the compressor "[p]ursuant to the terms of the governing Operating

---

[2] Anadarko has since drilled other wells on the acreage, at least one of which is now producing.

[3] Payout occurs when the costs of drilling and completing the well are recovered from the well's production. *Milestone Operating, Inc. v. ExxonMobil Corp.*, No. 14-09-00765-CV, 2013 WL 4007817, at *1 n.1 (Tex. App.—Houston [14th Dist.] Aug. 6, 2013, no pet.) (mem. op.).

Agreement[.]" Cromwell signed the authorization and paid the requested amount. However, Anadarko later claimed it sent Cromwell this authorization for expenditure in error, as he "should not [have] be[en] sent AFEs as a non-committed co-tenant" and did not have a signed joint operating agreement with Anadarko.

The primary terms of the Ferrer and Tantalo leases passed in February 2012 and March 2014 respectively. Under the secondary term of each agreement, Cromwell's leases would continue only if production were occurring. Though Cromwell had not drilled a well, pooled his leases with a producing lease, or entered into a joint operating agreement with Anadarko, Anadarko continued sending Cromwell joint interest invoices and cutting him revenue checks. It also continued communicating with Cromwell as if his leases were still effective. For example, Anadarko sent Cromwell a letter about revenue netting in April 2014, referring to him as an "owner," and sent him a division order in October 2015, asking him to certify his ownership interest in production in several properties. In 2016, it also listed Cromwell as a working interest owner on an exhibit to a joint operating agreement, and its internal records listed one of Cromwell's leases as "held by production."

Anadarko claims this too was a mistake. It says when it was identifying working interest owners for the since-drilled 75-24-2H well in 2016, it realized Cromwell's leases terminated at the end of their primary terms. Still, Anadarko did not share that realization with Cromwell, and it continued to pay him for his purportedly expired interest in the 75-26-1 well,[4] though it excluded him from revenue checks for other producing wells on the acreage.

---

[4] Indeed, Anadarko has continued to send Cromwell invoices and revenue checks for the 75-26-1 well even after he filed this lawsuit.

Then, working under its belief that Cromwell's leases had expired, Anadarko took leases from his lessors, Ferrer and the Tantalo Trust, in January 2017. Only in March 2018, in response to Cromwell's email following up on his request for information about his interest in the 75-24-2H well, did Anadarko inform him that "[d]ue to the passage of time," and because Anadarko "never received from [Cromwell] an executed well election/[authorization for expenditure] or [joint operating agreement] for any of the subject wells," his leases "expired" and had been "leased to [third] parties thereafter"—the third parties being Anadarko.

Cromwell sued Anadarko. He pursued declaratory judgment, asserted a trespass-to-try-title action, and sought damages for the revenue proceeds he contends are his under the leases he says never expired because he constructively participated in drilling sufficient to perpetuate his leases into the secondary term. He also alleged he and Anadarko formed a partnership, under which Anadarko breached its duties to him and committed fraud.

Anadarko filed traditional and no-evidence motions for summary judgment, contending all Cromwell's claims sound in trespass to try title, his leases terminated, the parties never formed a partnership, and all of Cromwell's claims except trespass to try title are barred by limitations. Cromwell filed a cross-motion for partial summary judgment, arguing his leases are valid.[5] The trial court held a hearing on the motions, then granted Anadarko's motion and denied Cromwell's without stating the grounds for its decision.

### *Standard of Review*

We review summary judgments de novo. *McGehee v. Endeavor Acquisitions, LLC*, 603 S.W.3d 515, 521 (Tex. App.—El Paso 2020, no pet.). In a traditional summary judgment motion,

---

[5] As Cromwell stated in his motion, whether his leases are still alive is "the core issue in the case."

the moving party bears the burden to establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Id.* A no-evidence summary judgment movant "must assert that there is no evidence of one or more essential elements of a claim or defense on which the non-movant would have the burden of proof at trial." *Garcia v. J.J.S. Enters., Inc.*, 225 S.W.3d 57, 60 (Tex. App.—El Paso 2005, no pet.). When a defendant moves for summary judgment based on an affirmative defense, it is entitled to summary judgment if it meets the burden of proving each essential element of that defense. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996). If both sides move for summary judgment and the trial court grants one but denies the other, we review all summary judgment evidence and determine all questions presented, issuing the judgment the trial court should have rendered. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *see also Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (reciting the same standard for motions for partial summary judgment). When the trial court does not specify its basis for granting summary judgment, we will affirm if any of the summary-judgment grounds presented have merit. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

### *Analysis*

On appeal, Cromwell first asserts that his leases are still valid because he "shouldered his share of the costs, risks, and liabilities for operating a well on his leases" such that he constructively participated in production sufficient to perpetuate his leases. Accordingly, he contends the evidence supports his lease-based claims—*i.e.*, his claims concerning the validity of his leases and asserted to recover lost revenue damages—and the trial court thus erred in granting Anadarko's summary judgment on these claims. He also argues the evidence supports his partnership-based

6

claims, which he asks us to remand for trial. Last, he maintains Anadarko failed to prove its limitations defense.

**A. Have Cromwell's leases terminated?**

The key issue in this appeal is whether Cromwell's leases are still valid. Cromwell says they are because production has occurred in paying quantities, he participated in that production, and no other conditions exist for him to maintain his leases. Anadarko disagrees that Cromwell's "participation" is sufficient to perpetuate his leases and contends his leases thus automatically terminated at the end of their primary terms. Because termination is an affirmative defense, Anadarko had to conclusively prove the leases terminated to obtain summary judgment on this ground. *Cimarex Energy Co. v. Anadarko Petro. Corp.*, 574 S.W.3d 73, 84 (Tex. App.—El Paso 2019, pet. denied).

Cromwell's leases define the conditions under which his property interests terminate. Because a mineral lease grants fee simple determinable to the lessee, the lessee's mineral estate may continue indefinitely, so long as he uses the land for its intended purpose. *Id.* at 89 (citing *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 394 (Tex. 2017)). However, the lessee's mineral estate terminates automatically if the event upon which it is limited occurs. *Id.* "[T]hough the habendum clause in a lease generally controls the mineral estate's duration, other clauses may be considered in determining the habendum clause's term." *Id.*

Both the Ferrer and Tantalo leases have a habendum clause defining the mineral estate's duration. Each habendum clause is "typical": it "states that the lease lasts for a relatively short fixed term of years (primary term) and then 'as long thereafter as oil, gas or other mineral is produced (secondary term).'" *Id.* (quoting *Anadarko Petro. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). Each lease's clause also requires "actual production in paying quantities," as is

standard practice. *Id.* (noting a habendum clause's use of the word "produce" means "producing in paying quantities").

Because the parties agree oil and gas has been produced in paying quantities on both leases, the determinative question is whether that production may be attributed to Cromwell. Cromwell maintains it can because while he did not physically drill his own well, he says he repeatedly participated in the liabilities, risks, and costs of Anadarko's production—in other words, Cromwell argues, he constructively participated in operations to perpetuate his leases. Anadarko counters that Cromwell's actions are insufficient to constitute production under the leases' terms and stated purpose. The parties agree *Cimarex* is central to resolution of this issue.

### i.    *Cimarex Energy Co. v. Anadarko Petroleum Corp.*

*Cimarex* involved very similar circumstances. In that case, Cimarex Energy Co. and Anadarko were cotenants who each held oil and gas leases with mineral interests in the same property. *Id.* at 80. Cimarex's lease contained a habendum clause providing for a primary term of five years and a secondary term stating the lease would remain in force "as long thereafter as oil and gas is produced from said land or from land with which said land is pooled." *Id.* at 81. After Anadarko drilled two producing wells on the property, which paid out during Cimarex's primary term, Cimarex sued Anadarko for failure to account for its share of production. *Id.* at 83. The parties entered into a settlement agreement, under which Anadarko made a lump-sum payment for production from the wells and was required to account to Cimarex monthly for its share of production. *Id.* at 83–84. However, Anadarko stopped paying Cimarex the month it believed Cimarex's lease expired based on the termination date for the primary term of its lease on the property, then asserted its entitlement to the top lease over Cimarex's mineral interest. *Id.* at 84.

8

Cimarex sued for breach of contract based on Anadarko's obligations under the settlement agreement to account for Cimarex's share of production from the wells. *Id.*

Anadarko moved for summary judgment based on its defense that Cimarex's lease terminated at the end of its primary term due to Cimarex's failure to drill or operate a well on the property before that date. *Id.* Cimarex filed its own motion for partial summary judgment, contending in relevant part that its lease continued into the secondary term because it was entitled to rely on Anadarko's production to extend the lease, or alternatively, the settlement agreement served as a joint operating agreement between Cimarex and Anadarko, satisfying any requirement that Cimarex may have had to actively participate in production. *Id.* at 85. The trial court granted Anadarko's motion and denied Cimarex's, determining that evidence established Cimarex's lease terminated at the end of its primary term. *Id.* Cimarex appealed, contending the lease terms were ambiguous as to whether it was required to directly cause production on the property to perpetuate the lease or, alternatively, the lease unambiguously allowed it to rely on Anadarko's production to extend the lease into the secondary term. *Id.* In support of its alternative argument, Cimarex argued the settlement agreement served as a joint operating agreement, allowing it to claim Anadarko's production as its own.[6] *Id.*

On appeal, this Court first concluded the lease was not ambiguous. *Id.* at 88. We then considered Cimarex's argument that it could rely on Anadarko's production to perpetuate its lease. *Id.* at 90. Cimarex argued the plain language of the habendum clause required production on the property regardless of who caused it. *Id.* Cimarex did not allege it caused or contributed to any

---

[6] Cimarex also asserted an estoppel argument and issue regarding an attorney's fees award not relevant here. *Cimarex*, 574 S.W.3d at 85–86.

9

production; instead, it argued the lease's use of the passive voice allowed it to rely on Anadarko's production to extend its lease into the secondary term.[7] *Id.*

In determining whether Cimarex itself had to cause production, we looked to precedent, namely this Court's decision in *Hughes v. Cantwell*, 540 S.W.2d 742 (Tex. App.—El Paso 1976, writ ref'd n.r.e.). In *Hughes*, the lessee made a similar argument: he contended he did not have to continue making delay rental payments to perpetuate his lease because another lessee began drilling on the property. 540 S.W.2d at 743. We rejected that argument primarily because the lease included several clauses imposing obligations on the lessee to engage in production (*e.g.*, a clause giving the lessee the power to pool the lease, a cessation of production clause providing the lease would not terminate if the lessee continued drilling operations after hitting a dry hole, and a force majeure clause providing the lease would not terminate if the lessee could not comply with the lease's terms). *Id.* at 744. Further, we found it significant that the stated purpose of the lease was for the drilling and producing of oil and gas such that it followed the lessee was expected to "do something to bring about that exploration and production of oil and gas" by, for example, doing the drilling himself, assigning it to someone else to drill, or pooling with others to benefit from their drilling—none of which the lessee did. *Id.* Indeed, the *Hughes* lessee *declined* an offer by the producing cotenant to join in sharing drilling expenses of a new well. *Id.* at 743. Thus, the lessee's failure to pay the delay rental or begin drilling on the leased land, "personally or constructively" resulted in the termination of his lease. *Id.* at 744 (collecting cases standing for the proposition that a lessee "must participate or pay his share of the drilling in order to keep his lease alive").

---

[7] The secondary term stated the lease remained active after the primary term "'as long thereafter as oil or gas is produced from said land or from land with which said land is pooled.'" *Id.* at 81.

Applying the principles of *Hughes* in *Cimarex*, we concluded the lease required Cimarex to "take some action to cause production" to keep its lease alive; it could not rely on a cotenant's production absent cash consideration paid to lessors. *Cimarex*, 574 S.W.3d at 93. Like the *Hughes* lease, Cimarex's lease expressly stated its purpose was to produce oil and gas. *Id.* at 91–92. It also contained several provisions requiring Cimarex to take action to keep the lease alive, implying that the lessors intended for Cimarex to cause production on the property to extend the lease into the secondary term, as in *Hughes*. *Id.* at 92. Though Cimarex sought to distinguish its lease from that in *Hughes*—namely because the *Hughes* lessee had the option to substitute actual production with payment of delay rentals in the secondary term (and Cimarex's lease did not offer that option)— we disagreed, concluding that "where a mineral lease states that its primary intent is for the exploration, drilling and production of oil and gas, it naturally follows that the lessors' intent is to require the lessee to, at some point in time, take action to cause production on the land, or provide some type of cash consideration, such as delay rental payments, to keep a lease alive." *Id.*

Cimarex also contended that unlike the lessee in *Hughes*, it made repeated, albeit unsuccessful, attempts to enter a joint operating agreement with Anadarko. *Id.* at 95. We agreed that if a lessee joins a joint operating agreement with a cotenant engaged in production on the land, that agreement fulfills the lessee's requirement to cause production and perpetuate the lease. *Id.* at 96. But we concluded Cimarex's unsuccessful attempts did not have the same effect. *Id.* at 95. Without a joint operating agreement, Cimarex and Anadarko were merely cotenants on the property who owed no duties to each other and were entitled to act independently. *Id.* Cimarex thus "knowingly took the risk that other tenants on the land might refuse to agree to a joint operating agreement," forcing it to commence production on its own as contemplated by the lease. *Id.*

11

We also rejected Cimarex's argument that the parties' settlement agreement should be considered the equivalent of a joint operating agreement. *Id.* at 96. "[T]he hallmarks of a joint operating agreement include an agreement to share in the expense of development and operation" and should describe the proportionate costs and liabilities to be shared by the parties. *Id.* at 97 (internal citation omitted). However, the parties' settlement agreement gave Cimarex the rights of a cotenant—and explicitly referred to Cimarex as a "non-participating co-tenant"—and did not contain any language suggesting the parties intended to enter a joint operating agreement, including an agreement to jointly develop the property, designate Anadarko as operator, or entitle Cimarex to consider Anadarko's production as its own. *Id.* Most significantly, the settlement agreement did not allocate any costs or risks between the parties or impose responsibility on Cimarex to share in any of Anadarko's potential losses; Cimarex instead "stood to reap the profits from Anadarko's production, while assuming no risk for any losses." *Id.* Thus, without a joint operating agreement, Anadarko simply had the duty to account to Cimarex as a cotenant for "the value of any minerals taken, less the reasonable costs of production and marketing"—though it also could not force Cimarex to share in the risks of production. *Id.* at 96 (collecting cases).

Cimarex also pointed to the parties' course of conduct after entering the settlement agreement as confirmation they intended for it to serve as a joint operating agreement, emphasizing that Anadarko sent it information regarding its proportionate costs of repairs and other expenses and asked for Cimarex's approval of costs. *Id.* at 98. Though the parties' post-settlement conduct was ultimately irrelevant given the unambiguous language of the settlement agreement, we agreed the evidence did not support a finding that the parties treated the settlement agreement as a joint operating agreement. *Id.* at 98–99. We concluded Anadarko shared information regarding operating costs and expenses to apprise Cimarex of how it calculated its net share of production;

12

there was no evidence Cimarex agreed to shoulder any of the costs or liabilities of that production as would be typical of parties to a joint operating agreement or inherent in the operation of the producing wells. *Id.* at 99. Instead, uncontroverted evidence reflected Anadarko paid all costs and assumed all risks of drilling and operating the wells, whereas Cimarex merely acquiesced in deductions of its share of operating costs. *Id.* Thus, even though at times in the parties' communications Anadarko referenced an "Operating Agreement" and referred to Cimarex as a "Working Interest Owner," we determined the parties did not engage in any conduct suggesting they treated the settlement agreement as a joint operating agreement. *Id.* at 99 & n.14.

### ii.     The parties' arguments regarding *Cimarex*'s holdings

Here, Cromwell contends he has done exactly what Cimarex did not: participated in production by sharing in its costs, risks, and liabilities. Specifically, he points to hundreds of pages of monthly joint interest invoice details, reflecting his proportional share of various costs associated with the 75-26-1 well, as well as his acceptance of Anadarko's proposal to fund a new compressor. He also contends he shared in costs related to the risks and liabilities of production by paying for "damages" related to the well and reimbursing Anadarko for spill containment, cleanup, and remediation costs. Cromwell also emphasizes he paid interest, which he would not have been required to do if he were a nonparticipating cotenant.[8]

Collectively, Cromwell says this is "constructive participation" sufficient to perpetuate his lease under both *Cimarex* and *Hughes*. *See id.* at 91 (discussing *Hughes*); *Hughes*, 540 S.W.2d at 743 ("Lessee must perform either directly or constructively as provided by the contract to keep it alive."). In other words, Cromwell contends by paying Anadarko for invoiced costs of the

---

[8] Cromwell relatedly notes Anadarko's shift to revenue netting did not alter the substance of his participation because on months when costs exceeded revenues, he still paid Anadarko.

producing well, he was "do[ing] something to bring about that exploration and production of oil and gas." *Cimarex*, 574 S.W.3d at 91 (internal quotation marks omitted). In sum, Cromwell maintains that he helped fund infrastructure that aided in the production of oil and gas on land covered by his leases such that he took "action to cause production on the land." *Id.* at 92. Cromwell thus contends Anadarko's position that his leases automatically terminated is contrary to the rule against surprise forfeitures. He asks us to reverse the trial court's grant of summary judgment on the termination issue and render judgment in his favor.

Anadarko counters that Cromwell's leases are indistinguishable from the lease in *Cimarex*, and both reflect the parties' intent that the lessee must cause the production of oil and gas to extend his lease beyond the primary term. Anadarko highlights several provisions in Cromwell's leases it contends confirm the lessors intended to impose upon Cromwell the obligation to cause production to keep the lease alive, including the stated purpose of the leases,[9] a continuous operations

---

[9] The Ferrer lease describes its purpose as "exploring by geological, geophysical and all other methods, and of drilling, producing and operating wells for the recovery of oil, gas, and other hydrocarbons . . . that may be produced from any well on the leased premises[.]" The Tantalo lease's "sole and only purpose" is "exploring, drilling, operating power stations, and construction of roads and structures thereon to produce, save, care for, treat and transport oil, gas and liquid hydrocarbons" from the leased land.

provision,[10] a force majeure clause,[11] the right to pool or combine his lease with cotenants, an assignment clause, the right to free use of oil and gas from the leased premises,[12] the right to remove property from the lease after the lease expired, and a provision requiring Cromwell to protect against drainage.[13]

---

[10] The Ferrer lease's continuous operations provision reads:

> If at the expiration of the primary term of this lease oil, gas or other minerals are not being produced from the leased premises or land pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon, this lease shall remain in force so long as drilling or reworking operations are prosecuted (whether on the same or different wells or on the land or land pooled therewith) with no cessation of more than ninety (90) consecutive days, and if they result in production, so long thereafter as oil, gas, or other minerals are produced from said land or land pooled therewith.

Likewise, the Tantalo lease states:

> If, prior to discovery and production of oil or gas on said premises, Lessee should drill a dry hole or holes thereon, or if after discovery and production of oil or gas, the production thereof should cease, permanently or temporarily, from any cause, and if in either case, this lease is not then otherwise maintained in force and effect, this lease shall not terminate if operations for drilling or reworking are commenced or resumed within sixty (60) days thereafter . . . .

[11] The Ferrer lease's force majeure provision reads:

> Lessee shall not be liable for delays or defaults in its performance of any agreement or covenant hereunder due to force majeure. . . . If Lessee is required, ordered or directed by any [law] to cease drilling operations, reworking operations, or producing operations, then until such time as such [law] or force majeure is terminated and for a period of ninety (90) days after such termination each and every provision of this lease that might operate to terminate it . . . shall be suspended and inoperative and this lease shall continue in full force. If any period of suspension occurs during the primary term, the time thereof shall be added to such term.

The Tantalo lease also has a force majeure provision, which states:

> Should Lessee be prevented, through no fault or omission on its own part, from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of or by operation of any federal or state law or any order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and . . . this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises. Lessee shall not be liable for delays or defaults in its performance of any agreement or covenant hereunder due to force majeure.

[12] The Ferrer lease gives Cromwell "free use of oil, gas and water from said land . . . for all operations hereunder, including, but not limited to, repressuring, pressure maintenance, cycling, and secondary recovery operations . . . ." Similarly, the Tantalo lease gives Cromwell "free use of oil or other liquid hydrocarbons . . . for the conduct of all drilling and producing operations conducted on the leased premises . . . ."

[13] The Tantalo lease requires that if a well on adjacent land begins producing oil or gas and is draining the leased premises, "Lessee shall . . . either adequately protect the oil and gas under the lands covered hereby from such drainage by drilling such offset protection well or wells as a reasonably prudent operator would drill under the same or similar

15

Anadarko then asserts that to cause production and perpetuate his leases under *Cimarex*, Cromwell could have drilled a well himself, assigned his lease to someone else to drill, pooled his lease with others and benefitted from their drilling, or entered a joint operating agreement with a drilling cotenant. Because Cromwell did none of those things, Anadarko says his leases automatically terminated when their primary terms expired, even though (like Cimarex) Cromwell repeatedly asked Anadarko to participate in its wells to no avail.

As to Cromwell's main argument—that he constructively participated in drilling operations by paying his share of invoiced costs—Anadarko maintains it treated Cromwell no differently from Cimarex. Specifically, Anadarko emphasizes that we rejected Cimarex's position that Anadarko treated it as if the parties' settlement agreement was indistinguishable from a joint operating agreement, even though the record showed (1) Anadarko repeatedly sent Cimarex joint interest invoices and authorizations for expenditures; (2) Anadarko referred to Cimarex as a "working interest owner" in various communications; and (3) Anadarko stated that an authorization for expenditure was prepared pursuant to the terms of an "Operating Agreement" governing the well. Anadarko distinguishes the costs Cromwell paid as "operating expenses" because the costs were incurred after the 75-26-1 well was already producing in paying quantities. Because Cromwell did not share in the "costs of drilling, completing, and obtaining initial production" from an Anadarko well, Anadarko says those payments cannot amount to participation or indicative of a joint-operating relationship; in other words, Anadarko maintains Cromwell did not share in the risk of drilling or exploration, including the risk that a well might be unprofitable. Thus, without Cromwell's participation in production, Anadarko says it treated Cromwell no

circumstances and by completing and producing the same . . . or, in the alternative, execute and deliver to Lessor a partial release surrendering the horizon(s) being drained . . . ."

16

differently than its cotenant in *Cimarex*. Because Cromwell neither signed a joint operating agreement with Anadarko nor took action to cause production of oil and gas during the primary terms of his leases, Anadarko contends a straightforward application of *Cimarex's* holdings means Cromwell's leases automatically terminated at the end of the primary terms.

### iii.     Applying *Cimarex*

As an initial matter (though neither party disputes it), under *Cimarex*, Cromwell was required to "take some action to cause production" on the leased property to keep his leases alive, despite the use of the passive voice in the habendum clause of each of his leases. *See Cimarex*, 574 S.W.3d at 93. Both the expressly stated purpose of Cromwell's leases and the other provisions noted above align with the portions of the *Cimarex* lease we found indicative of the parties' intent to require Cimarex to take action to cause production on the subject project. *See id.* at 92 (discussing "various other provisions imposing requirements on Cimarex to take action in other contexts to keep the lease alive," including a cessation clause, a pooling clause, an assignment clause, the right to use oil and gas for operations, and the right to remove property from the lease at the end of the lease's term).

However, the action Cromwell took was insufficient to maintain his leases under *Cimarex*. Though Cromwell frames his argument differently than Cimarex did,[14] his purported participation is substantively equivalent to Cimarex's. For example, Cromwell points to his payments of monthly joint interest invoices as evidence of his construction participation because the invoices included costs for certain items (like snubbing units, compressors, and pumps) that he contends helped the well "produce oil and gas longer." He also underscores the authorization for

---

[14] Cimarex did not argue its actions amounted to constructive participation. Instead, it contended it could rely on Anadarko's production to perpetuate its lease.

17

expenditure, in which he paid his share of funding a new compressor, which he argues amounts to participation because a nonparticipating cotenant would not ordinarily fund new equipment before it was installed. But Cimarex paid the same types of costs. For example, Cimarex argued it too paid its proportional share of expenses (which Anadarko netted out of its monthly share of production) in the form of joint interest billing statements. Even after Anadarko stopped paying Cimarex for production from the wells because it contended Cimarex's leases terminated, Anadarko continued to issue Cimarex joint interest billing statements reflecting Cimarex's "equity share," bill Cimarex for its share of operating expenses, and notify Cimarex of planned future expenditures for which it would be responsible. Cimarex also pointed to authorizations for expenditure Anadarko issued to fund, for example, repair costs and costs to switch a well to a new type of pumping system. Despite these examples, we concluded there was "no evidence that Cimarex agreed to shoulder any of the costs or to assume any of the liabilities of that production[.]" *Id.* at 99. Instead, Cimarex "accepted the invoices and other cost information that it received from Anadarko and acquiesced in deductions made by Anadarko in calculating Cimarex's net share of production." *Id.*

The costs Cromwell points to as his "constructive participation" instead reflect his proportionate share of a producing well's operating expenses ordinarily owed by a nonparticipating cotenant. *See Cox v. Davison*, 397 S.W.2d 200, 203 (Tex. 1965) (noting that the producing cotenant owes its nonparticipating cotenant "the proportionate market value of the product less the proportionate necessary and reasonable costs of producing and marketing"). These costs are not indicative of the parties' intent that Cromwell "shouldered any risk or liabilities inherent in the operation" of the 75-26-1 well. *Cimarex*, 574 S.W.3d at 99. Cromwell insists he participated in production because when costs exceeded revenues, he still paid Anadarko for its

18

monthly expenses. Indeed, "the law raises no obligation binding a nonjoining cotenant to pay a part of the costs *of development*." *Cox*, 397 S.W.2d at 201 (emphasis added); *see also Cimarex*, 574 S.W.3d at 96 ("Although a co-tenant must share the profits it reaps from production on the land with other co-tenants, it cannot force the other co-tenants to share in the risks; in other words, 'if a co-tenant drills a dry hole, he does so at his own risk and without right to reimbursement from his co-tenant (in the absence of an agreement therefor) for the drilling costs.'" (quoting *Willson v. Superior Oil Co.*, 274 S.W.2d 947, 950 (Tex. App.—Texarkana 1954, writ ref'd n.r.e.))). But once "mineral property is developed by one cotenant," the producing cotenant is entitled to "be reimbursed out of production if and when production results." *Cox*, 397 S.W.2d at 201–02. That is what Anadarko's invoiced costs for the 75-26-1 well reflect—even in months when costs exceeded production revenues. Just as we did not convert Cimarex's payments for repair costs and equipment replacements to "constructive production" that would perpetuate its lease, we decline to do the same here. *See Cimarex*, 574 S.W.3d at 98–99.

*Cimarex* also forecloses Cromwell's argument that Anadarko confirmed his ongoing interests by referring to him as a "working interest owner" or "owner" in various communications and noting it prepared an authorization for expenditure subject to the "operating agreement" governing the well. Again, we rejected the same argument in *Cimarex*, where Anadarko also referenced the existence of an "operating agreement" (despite no joint operating agreement between the parties) and referred to Cimarex as a "Working Interest Owner." *Id.* at 99 n.14. We noted that "regardless of how the parties may have referred to each other in communications, the parties did not in fact engage in any conduct that would suggest that they were treating the Settlement Agreement as a joint operating agreement with each other." *Id.* at 99. Though here there is no settlement agreement between Cromwell and Anadarko further defining the relationship as

19

there was in *Cimarex*, that does not change the fact that despite repeated requests, Cromwell was never provided the opportunity to enter a joint operating agreement with Anadarko. Thus, despite Anadarko's references to Cromwell as an "owner," as in *Cimarex*, the parties did not engage in conduct that would otherwise suggest they had a joint operating relationship. Cromwell's course-of-conduct argument cannot overcome the absence of an agreement between the parties "to share in the 'expense of development and operation.'" *Id.* at 97 (quoting *Willson*, 274 S.W.2d at 951). Because Cromwell cannot "rightfully say that the exploration and development of the premises is his act in whole or in part[,]" he has not constructively participated in production. *Willson*, 274 S.W.2d at 951.

Anadarko (in its telling, mistakenly) treated Cromwell as if his leases had not expired for years after their primary terms lapses by continuing to send him joint interest billing statements and revenue checks, accepting his payment for well expenses, and communicating with him as if his interests were still valid; however, that conduct cannot change the terms of an unambiguous mineral lease outlining the terms under which Cromwell's interests terminated. Because Cromwell did not cause production of oil or gas on the leased land, his leases terminated at the end of the primary term. And because the habendum clause in the leases is a special limitation, Cromwell's forfeiture argument is inapplicable, as special limitations do not result in forfeitures. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 606 (Tex. 2018) (noting "[a] special limitation in an oil and gas lease provides that the lease will automatically terminate upon the happening of a stipulated event," including, for example, "failure to commence drilling or reworking operations within the time the lease required").

Having determined Cromwell's leases automatically terminated at the end of their respective primary terms, we do not need to consider whether evidence supports Cromwell's lease-

based claims.[15] The trial court properly granted summary judgment to Anadarko on its affirmative defense of limitations. Issues One and Two are overruled.

## B. Does evidence support Cromwell's partnership-based claims?

Cromwell also argues the trial court erred in granting summary judgment on his partnership-based claims (which do not turn on whether his leases remain valid).[16] He claims evidence supports several factors indicating a partnership exists under the Texas Business Organizations Code, and his partnership-based claims should therefore be remanded for trial.[17]

Anadarko responds that the evidence Cromwell points to as indicative of his partnership with Anadarko is duplicative of the evidence he cites in support of his constructive participation argument and equally consistent with Anadarko accounting to Cromwell as a cotenant. Anadarko also argues Cromwell has no evidence of a partnership that would satisfy the statute of frauds. Without a partnership, Anadarko maintains it owed no fiduciary duty to Cromwell, and Cromwell's breach of fiduciary duty and accounting claims necessarily fail as a matter of law. Anadarko also contends Cromwell's fraud claim fails because it hinges on a legal question—i.e., Anadarko's representations that his leases were valid—and fraud claims cannot be predicated upon legal misrepresentations.

### i. Did Anadarko and Cromwell form a partnership?

---

[15] To the extent Cromwell argues his breach of contract claim is based not on his leases but on the authorization for expenditure Anadarko sent in June 2011, that agreement cannot support his broader argument that his leases remain valid because the authorization for expenditure lacks the hallmarks of a joint operating agreement described above. The authorization for expenditure instead concerned the narrow issue of whether Cromwell elected to participate in the costs of installing a new compressor on the 75-26-1 well.

[16] Specifically, Cromwell sued Anadarko for breach of fiduciary duty, an accounting under the Texas partnership statute, and fraud.

[17] Cromwell did not seek summary judgment on his partnership-based claims in the trial court, so we cannot render judgment in his favor as to these claims.

The Texas Business Organizations Code defines a partnership as "an association of two or more persons to carry on a business for profit as owners," regardless of whether they intended to create a partnership or call their association a partnership or joint venture. TEX. BUS. ORG. CODE ANN. § 152.051(b); *but see Ingram v. Deere*, 288 S.W.3d 886, 898 (Tex. 2009) (expressing skepticism that the legislature "intended to spring surprise or accidental partnerships on independent business persons"). The statute outlines a list of factors indicating that individuals have formed a partnership, including:

(1) receipt or right to receive a share of profits of the business;

(2) expression of an intent to be partners in the business;

(3) participation or right to participate in control of the business;

(4) agreement to share or sharing:

    A. losses of the business; or

    B. liability for claims by third parties against the business; and

(5) agreement to contribute or contributing money or property to the business.

TEX. BUS. ORG. CODE ANN. § 152.052(a). A partnership may exist even without proof of all the listed factors, as courts consider whether a partnership exists under the statute through a totality-of-the-circumstances test. *Energy Transfer Partners, L.P. v. Enter. Products Partners, L.P.*, 593 S.W.3d 732, 737 (Tex. 2020). These factors "serve as a proxy for the common law requirement of intent to form a partnership by identifying conduct that logically suggests a collaboration of a business's purpose and resources to make a profit as partners." *Ingram*, 288 S.W.3d at 896. The statute also provides that co-ownership of property by itself does not indicate that a person is a partner in the business, even if the ownership is "combined with sharing of profits from the property." TEX. BUS. ORG. CODE ANN. § 152.052(b)(2)(B).

22

Cromwell argues there is evidence of at least four of the partnership factors and thus a fact issue exists for trial. First, he claims he has "receive[d] a share of profits[,]" pointing to Anadarko's repeated revenue payments. *See id.* § 152.052(a)(1). That Cromwell received revenue checks from the 75-26-1 well is undisputed.

Next, Cromwell contends he and Anadarko expressed their "intent to be partners in the business," pointing to different communications and invoices he received from Anadarko. Certain documents were titled "Partner Account Statement" and included a "Partner Number," labeling Cromwell's interest with a unique identifier that included the letters "JV," for joint venture, which Cromwell also included on the memo line of his checks to Anadarko. When determining whether these examples indicate an intent to be partners in the legal sense, "[w]e must look to the words used, the context in which the statement was made, and the identity of the speaker to determine if such a statement constitutes legally significant evidence of an expression of intent." *Westside Wrecker Serv., Inc. v. Skafi*, 361 S.W.3d 153, 170 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (citing *Ingram*, 288 S.W.3d at 900). "Evidence of expressions of intent could include, for example, the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement." *Ingram*, 288 S.W.3d at 900. "[M]erely referring to another person as 'partner' in a situation where the recipient of the message would not expect the declarant to make a statement of legal significance is not enough." *Id.*; *see Westside Wrecker*, 361 S.W.3d at 170 (noting that "the term 'partner' is regularly used in common vernacular and may be used in a variety of ways").

Simply including the word "partner" on invoices or identifying Crowell's account with a "JV" number is not enough to constitute legally significant evidence of Anadarko's expression of intent to be business partners with Cromwell because including those terms on invoices is not a

situation in which any recipient would expect a statement of legal significance. *See Ingram*, 288 S.W.3d at 900. This is particularly true when viewed in the larger context of the parties' relationship, as Anadarko never assented to Cromwell's multiple requests to participate in the wells Anadarko drilled and planned to drill over the course of his leases. Looking to the words used in context, there is no evidence of the parties' expression of their intent to be business partners.

Third, Cromwell claims he shared in the losses of the business because Anadarko's joint interest billing statements included line items reflecting his proportionate cost for damages and environmental remediation. He also argues he shared in liabilities because he accepted Anadarko's authorization for expenditure to replace a compressor and thus accepted the risk his investment would prove to be a loss. However, the payments Cromwell points to are operating expenses associated with the 75-26-1 well, as discussed above. "[S]haring specific expenses is not evidence of sharing losses or liabilities." *Westside Wrecker*, 361 S.W.3d at 172 (citing *Ingram*, 288 S.W.3d at 902). There is no evidence demonstrating the parties shared losses or liability.

Lastly, Cromwell similarly contends he contributed money and real property (*i.e.*, his working interest in the minerals) to the business. However, as above, his evidence of cash contributions reflect his proportional share of various costs associated with the 75-26-1 well. "[S]haring in expenses does not necessarily constitute contributing money or property to a partnership." *Id.* While the sharing of expenses is consistent with a partnership between parties, it is equally consistent with the possibility that Cromwell and Anadarko agreed as cotenants to share operating costs with the 75-26-1 well, in which Cromwell contributed his proportionate interest to expenses. *See id.* (citing examples). Indeed, Cromwell paid Anadarko—not to an alleged partnership entity. *See id.* at 172–73. Further, any real property contribution to the purported

partnership fails as a matter of law because "[t]he law is clear that an interest in real estate cannot become a partnership asset unless the agreement concerning the property is in writing the same as any other contract concerning the sale of land." *Carpenter v. Phelps*, 391 S.W.3d 143, 153 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

In sum, the only evidence Cromwell has raised of his alleged partnership with Anadarko is the first statutory factor: that he received a share of profits through the 75-26-1 well's revenue checks. But we agree with Anadarko that this is equally consistent with Anadarko accounting to Cromwell as a cotenant. Because cotenants sharing profits from a property, without more, does not indicate a partnership, Cromwell has raised no evidence of a partnership with Anadarko.

Further, even assuming Cromwell had raised evidence supporting the existence of a partnership, that evidence cannot overcome the statute of frauds. What Cromwell points to as evidence of the purported partnership reflects one business purpose: the exploring, drilling, or producing of hydrocarbons in his leased land. In other words, Cromwell contends even though he has no signed joint operating agreement with Anadarko, the two parties created a partnership with the same effect. But a joint operating agreement or joint venture is subject to the statute of frauds. *Id.* Absent a writing to satisfy the statute of frauds, there is no evidence of the parties' intent to create a partnership for any business purpose other than one unenforceable under the statute of frauds—*i.e.*, to develop the mineral acreage. *See id.*

Cromwell and Anadarko were cotenants—not partners—and thus did not owe one another fiduciary duties. *Zimmerman v. Texaco, Inc.*, 409 S.W.2d 607, 614 (Tex. App.—El Paso 1966, writ ref'd n.r.e.) ("[T]here exists no fiduciary or agency relationship between cotenants or tenants in common, in the absence of agreement or contract so providing . . . . [E]ach owner in a co-

tenancy acts for himself[.]"). Summary judgment on Cromwell's claims for breach of fiduciary duty and accounting under the partnership statute was therefore proper.

### ii. Can Cromwell's fraud claim survive absent a partnership with Anadarko?

Cromwell's fraud claim is premised on Anadarko's representations that his leases were still valid after their respective primary terms lapsed. In other words, Cromwell says if Anadarko's termination defense is correct and his leases have expired, its subsequent monthly representations regarding his ongoing interests are false.

However, "[g]enerally speaking, fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law." *Nat'l Sec. Life & Cas. Co. v. Benham*, 233 S.W.2d 334, 338 (Tex. App.—Amarillo 1950, writ ref'd n.r.e.); *see Fina Supply, Inc. v. Abilene Nat. Bank*, 726 S.W.2d 537, 540 (Tex. 1987) ("A representation as to the legal effect of a document is regarded as a statement of opinion rather than of fact and will not ordinarily support an action for fraud."). Though exceptions to this rule exist, including where there is a fiduciary relationship between the parties, none applies here—namely because we concluded no partnership exists between Cromwell and Anadarko. *See Fina Supply*, 726 S.W.2d at 540 (discussing exceptions to the general rule).

Whether Cromwell's leases were valid or terminated at the end of their primary terms is a legal question. Because Cromwell's fraud claim is based on a misrepresentation of law, the trial court properly granted summary judgment in Anadarko's favor.

Issue Three is overruled.[18]

### CONCLUSION

---

[18] Having overruled Issues One, Two, and Three, we need not address Issue Four regarding Anadarko's limitations defense.

For the above reasons, we affirm the trial court's judgment.

YVONNE T. RODRIGUEZ, Chief Justice

August 4, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.